**CEDAR–RIVERSIDE ENVIRONMENTAL DEFENSE FUND, a Minnesota non-profit Corporation, et al., Plaintiffs,**

v.

**Carla Anderson HILLS, Secretary of Housing and Urban Development, et al., Defendants.**

Civ. No. 4–73–592.

United States District Court,
D. Minnesota,
Fourth Division.

March 29, 1976.

Order May 14, 1976.

Order July 29, 1976.

---

John H. Herman, M. Sue Wilson and Timothy Regan, Minneapolis, Minn., for plaintiffs.

Mel I. Dickstein, Minneapolis, Minn., for federal defendants.

David Graven and James Holmes, Minneapolis, Minn., for Minneapolis Housing and Redevelopment Authority.

Jerome F. Fitzgerald, Minneapolis, Minn., for City of Minneapolis.

Wayne G. Popham and Loren Tucker, Minneapolis, Minn., for defendant Cedar-Riverside Associates, Inc. and its affiliated companies.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER FOR JUDGMENT

The above matter came on for trial before a Special Master, Edward J. Parker, on May 27, 1975, on issues made by the Amended Complaint.

The Special Master having heard the evidence, considered the exhibits, the arguments of counsel and being fully advised in the premises, makes the following Findings of Fact and Conclusions of Law. To the extent some of the Findings of Fact contain Conclusions of Law, they are adopted as such. Said Findings of Fact and Conclusions of Law will be submitted to the Court for its Order for Judgment.

## PROCEDURAL FINDINGS OF FACT

### The Parties

(1) The plaintiffs in this action are the Cedar-Riverside Environmental Defense Fund, a Minnesota non-profit corporation composed of members who live or work in Cedar-Riverside; the individual plaintiffs are persons who live or work within or near the Cedar-Riverside Urban Renewal Area, some of whom are students at the University of Minnesota; the Minnesota Public Interest Research Group—University of Minnesota Local Board, the Model Cities Planning Council, the Model Cities Policy Board, and the Cedar-Riverside Project Area Committee, the citizens advisory committee to the Minneapolis Housing Authority on renewal in the area, all of which are organizations interested in the Cedar-Riverside area. All plaintiffs have proper standing to bring this action, having shown they are directly affected and suffer injury in fact.

(2) The defendant Carla Anderson Hills is the Secretary of Housing and Urban Development (HUD); Thomas T. Feeny is the Director of the Minnesota HUD Area Office; Otto Stolz is the Director of the HUD New Communities Office; and Richard H. Jefferson is the Chairman of the Minneapolis Housing and Redevelopment Authority (MHRA). The defendants Cedar-Riverside Associates (CRA) and its affiliated companies, Cedar-Riverside Land Corporation, Cedar-Riverside Land Company, and Cedar-Riverside Properties, collectively referred to in these findings as "Cedar-Riverside Associates", together with the defendant Batzli Electric Company, are private developers in the urban renewal area. The defendants Augsburg College, Fairview Hospital, and the University of Minnesota are institutions located within the urban renewal area.

*The Project*

(3) This action involves the Cedar-Riverside Urban Renewal Area, an area of approximately 336 acres located in the City of Minneapolis, bounded by Interstate 94 on the south, Interstate 35 on the west, and the Mississippi River on the north and east. The area is located between the main campus of the University of Minnesota and downtown Minneapolis. The private development in the urban renewal area consists of approximately 100 acres. It is a part of the New Communities Program and is being constructed pursuant to 42 U.S.C. § 4511 *et seq.* It is designated as the "Cedar-Riverside New Town in Town."

(4) The Urban Renewal Plan for the Cedar-Riverside area was adopted in 1968, following a period of study and planning by city agencies and community groups that began in the early 1950's. The adoption of the plan involved a finding that the area was blighted and in need of urban renewal.

(5) At one time the Cedar-Riverside area had a population of about 20,000 people, but over the years the deterioration of the neighborhood, university and hospital expansion and freeway construction caused a drop in population to a low of about 4,000 people. Cedar-Riverside Associates owns most of the property in the New Town. Only about 30 to 50 homes are owned by other persons.

(6) The development plan for the New Town contemplates a ten-stage residential and commercial development program that will cover the period from about 1972 to 1991. Upon completion, approximately 12,-500 dwelling units and 2,500,000 square feet of commercial or cultural space is anticipated. A population is projected of between 25,000 and 30,000 people. The plan contemplates total clearance and new housing at 125 dwelling units/acre.

(7) Stage I of the project has already been built. It consists of approximately 1,299 dwelling units which house about 2,500 people in a combination of high-rise and low-rise structures. On August 30, 1971, HUD filed the first EIS on the project.

*The Litigation*

(8) On December 13, 1973, the plaintiffs began this action challenging the adequacy of the first Environmental Impact Statement (EIS), challenging compliance with the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332 *et seq.,* the Clean Air Act of 1970, 42 U.S.C. § 1857 *et seq.,* the Minnesota Environmental Policy Act (MEPA), Minn.Stat. § 116D.01 *et seq.,* and the Minnesota Environmental Rights Act, Minn.Stat. § 116B.01 *et seq.*

(9) At a hearing on March 22, 1974, on motions of defendants to dismiss the suit, HUD indicated to the Court its intention to prepare a second environmental impact statement on Stage II. The Court ordered an EIS on Stage II *and* the Cedar-Riverside project at maturity. This was embodied in a subsequent stipulation that was executed by the parties and approved by the Court on July 30, 1974. Thereafter the action was held in abeyance pending the filing of the new EIS on Stage II and the project at maturity.

*The Federal and State Environmental Impact Statements*

(10) The Minnesota Environmental Policy Act, Minn.Stat. 116D.01 *et seq.,* empowers the Minnesota Environmental Quality Council to require an EIS for major actions of government agencies in the State of Minnesota. On August 21, 1974, the Minnesota Environmental Quality Council designated the defendant Housing and Redevelopment Authority as responsible agent to prepare an EIS covering the Cedar-Riverside New Town Project, Stages II through X.

(11) After HUD prepared a draft of the EIS, it was distributed for review and comment on October 15, 1974. The EIS was circulated to 123 entities, consisting of 15 federal, 13 state, 2 regional, 2 county, 4 city, and 21 institutional and private agencies. Public hearings on the draft EIS were held in Minneapolis on November 25, and 26, 1974, by HUD and by the Housing and Redevelopment Authority, to afford those interested an opportunity to comment on

the draft statement. Extensive written comments and oral testimony were received on the draft. HUD filed the final EIS for Stage II and the entire Cedar-Riverside New Community Project on February 10, 1975. After the final EIS was filed, there was no further response or comment on it either by the plaintiffs in this action or by any other persons, other than this litigation which was commenced forthwith.

(12) The EIS was prepared over a nine-month period. It involved the services of thirty persons in HUD, plus seven consultants. In addition, other personnel from the Minneapolis Housing and Redevelopment Authority, the City of Minneapolis, Cedar-Riverside Associates, and the Metropolitan Council were involved in developing factual data for the EIS.

(13) On March 6, 1975, the Housing and Redevelopment Authority submitted to the Minnesota Environmental Quality Council the final federal EIS. The EIS was forwarded to the Environmental Quality Council for filing without comment by the Housing and Redevelopment Authority.

(14) The Minnesota statutes and regulations require additional factors to be considered in a state EIS including: (1) The impact of state government on any federal controls associated with the proposed action; and (2) The multi-state responsibilities associated with the proposed action. These additional state requirements were included in the final federal EIS, at the request of the Housing and Redevelopment Authority. Other additional procedural and substantive requirements of MEPA not satisfied in the HUD EIS are discussed at VII, infra.

(15) Under the regulations of the Minnesota Environmental Quality Council, the Council has 45 days from submission to it of the final EIS to take action requiring revision or change. The Minnesota Environmental Quality Council took no action on the adequacy of the EIS within the 45 day period, indicating in its minutes the co-terminus authority of this court to review the EIS's adequacy. The defendants also concurred in this jurisdiction.

SUBSTANTIVE FINDINGS OF FACT

I. THE ENVIRONMENTAL IMPACT STATEMENT IS INADEQUATE BECAUSE IT FAILS TO PROVIDE SUFFICIENT DATA ON THE PROJECT'S ECONOMIC FEASIBILITY AND ECONOMIC EFFECTS TO ALLOW ASSESSMENT OF COUNTERVAILING INTERESTS, THE FEASIBILITY OF ALTERNATIVES OR A FULL ANALYSIS OF THE ENVIRONMENTAL EFFECTS.

A. *Economic considerations relating to the feasibility of this project as proposed and the range of reasonable alternatives are not discussed. The EIS is inadequate in the absence thereof because of the notice to HUD of the need for major changes in the financing of the project provided by the Landauer Report.*

1. The EIS, Section 2.2.2.3(f), identified an intimate relationship between land economics and the high-rise character of development. The Landauer Report, a financial evaluation of the feasibility of the Cedar-Riverside project prepared by Landauer Associates real estate consulting firm for HUD in October, 1974, confirms the burden of land costs for this development and their effect in predetermining a development proposal calling for high-rise, very high density housing.

2. Mr. Broun, Director of the HUD office of Environmental Quality, testified that while economics of a project were not an environmental impact per se, they determined the range of reasonable alternatives to be considered in the environmental impact statement. Here, the Landauer Report makes clear the "fundamental problem with the Cedar-Riverside development centers about the cost of the land," and indicates that the project may not be able to go forward unless land costs are written down by a significant percentage. That report also indicates the financial unfeasibility of the project as presently proposed, even at very high densities. That conclusion is the

essence of the Wiles Memorandum dated May 1, 1974, which indicates the precarious financial status of the project and the need for exploration of various options to take over the project by HUD.

3. Lower density alternatives, with possibilities of low-rise design, are far more feasible if the burden of high land costs is reduced. A knowledge that significant land write-downs were necessary to continue the project increases the range of reasonable alternatives and makes it necessary to discuss in far greater detail lower density alternatives which might ameliorate adverse environmental impact and which become increasingly feasible as the land cost declines. A discussion of the feasibility of alternatives would require an analysis of land cost per acre at various densities and different types of construction coupled with an estimate of the amount of subsidy (land write-down) necessary to make each feasible. Only in this way could a subsequent decision maker balance the benefit and cost of each alternative on the environment.

4. The absence of any discussion of the New Community financial feasibility and the likelihood of land write-downs allows the predetermination of high-density, high-rise construction that resulted in the proposed project to remain unexplored for the subsequent decision maker. Given the notice on which the agency was placed before the draft EIS by the Wiles Memorandum and before the final EIS by the Landauer Report, a full discussion of the effects of significant land write-downs in increasing the feasibility and range of alternatives is necessary to permit a reasoned choice of alternatives.

B. *The EIS fails to provide sufficient data on the Project's economic effects to allow assessment of countervailing interests, or a full analysis of the environmental effects.*

1. *Public costs and benefits.* Witnesses Hartman and Kirschner testified that a cal-

culation of the fiscal impact of development on public agencies was very closely related to calculation of environmental effects resulting from the level at which those agencies can provide services, maintenance and amenities. The public interest which encourages density of development in urban renewal is in part ascribable to the expected resulting increase in the property tax base. An accurate assessment of environmental effects of lower density design and this countervailing consideration would require a detailed analysis of public costs as well as benefits. Such an analysis is lacking in the EIS. The HUD EIS team made no attempt to analyze the economic cost and benefits generally and specifically made no attempt to analyze government revenue increases versus the increased costs of providing services.

2. *Irreversible and irretrievable commitments of resources.* There is a limited amount of low interest or governmentally insured housing mortgage money available and a limited amount of housing subsidy money available. Investment in housing is thus a commitment of scarce resources. Mr. Kirschner testified that there is a significant difference among housing types as to the amount of housing which can be built for a given investment. Kirschner and Downs both testified that high-rises cost significantly more than low-rises to build. Given the scale of this project, that difference would appear significant should emphasis be shifted to lower rise construction. The EIS provides no information on per unit or per square foot costs of Cedar Square West and the proposed Stage II building compared to other construction prototypes. Thus, basic information is lacking which is necessary to make important environmental judgments regarding the cost effectiveness of the public subsidy dollars in the Cedar-Riverside project.

II. THE ENVIRONMENTAL IMPACT STATEMENT IS INADEQUATE BECAUSE IT FAILS TO FULLY AND ACCURATELY DISCUSS A FULL

ARRAY OF ALTERNATIVES WHICH COULD SIGNIFICANTLY ALTER THE ENVIRONMENTAL IMPACT OF THE PROJECT.

A. *The range of alternatives discussed in the EIS omits reasonable options that would have significantly different environmental effects and could reduce negative environmental aspects of the project as proposed.*

1. In order to allow a decision maker to evaluate the environmental effects of various alternatives and to prevent the premature foreclosure of alternatives which may reduce environmental impact, it is necessary for the EIS to present all reasonable options to the project as proposed. Testimony shows that four prototypical alternatives which would significantly alter environmental impact were not discussed: low-rise, high-density cluster housing, a mixture of densities and designs, ownership alternatives and the combination alternative proposed by plaintiff Cedar-Riverside Environmental Defense Fund (CREDF).

2. *Low-rise, high-density cluster housing.* Testimony of Prof. Clare Cooper, Professor of Architecture and Landscape Architecture at the University of California —Berkeley, described at length the concept of low-rise, high-density cluster housing and discussed its advantages, for some population groups. One such basic advantage over high-rise construction cited was preservation of important features of the single family home within a multi-family context. Individual entrances or entrances shared by only six or eight units without internal hallways and private or semi-private open space were described as encouraging stability, commitment to place, proprietary feelings and feelings of community, all revolving around common concerns for shared space over which people exert territorial claims.

3. A second such basic advantage is that low-rise, high-density cluster housing avoids most problems of childrens' play associated with high-rise living. Prof. Cooper testified that, while there are ways to improve the lot of children in high-rises, e. g. wide, outdoor corridors viewed from apartment windows or supervised play areas, low-rise cluster housing is a clearly superior solution to these problems. In such housing, childrens' outdoor play is easily observable and accessible in an area which is part of the parents territorial domain. Prof. Cooper testified that this type of housing is a necessary alternative for families with children. Similar recommendations for low-rise buildings to foster better surveillance of play were made by the developer's social consultant, Professor David Cooperman.

4. Other witnesses also testified that low-rise housing had positive advantages for families if it involved semi-private or private open space; that the Model Cities program was encouraging the development of moderate density cluster housing reminiscent of single family homes with a goal of attracting families back to Minneapolis; and that low-rise cluster housing was a reasonable alternative to the Cedar-Riverside project as proposed.

5. Testimony indicated that such housing could be developed at 40 to 60 du/acre. This range, in the middle between the 30–35 and 60–80 du/acre range presented in the EIS, maximizes the number of units in a low-rise setting. Its feasibility is significantly increased if a land write-down occurs. The high-rise housing in *The Costs of Sprawl*, discussed in the EIS, was at 30 du/acre and the so-called "high density" mix in that report is at 19 du/acre. Therefore, the advantages in terms of effect on urban systems described in *The Costs of Sprawl* would be present in this 40–60 du/acre alternative, without going beyond diminishing returns into the negative social effects and environmental effects such as the high carbon monoxide levels and the high energy use which characterize very high densities.

6. The testimony indicated that reduced construction costs per unit in the low-rise, high-density alternative would make up for

increased land costs per unit in comparison with high-rises; thus such an alternative maximizes units per capital dollar and minimizes commitments of irretrievable and irreplaceable resources.

7. Because of its preferability as an environment for families with children, low-rise cluster housing represents a practical way significantly to increase the number of larger units in the project and thereby more closely meet the pressing housing needs of the city and region for family housing (as described in the EIS) in a relatively high density context. This type of housing meets the standards of the Urban Renewal Plan to provide "through public and private efforts, various types of housing, thereby insuring a heterogeneous population in age, marital status, education, income and family size".

8. Low-rise, high-density cluster housing is a reasonable and feasible alternative which combines the positive effects on urban systems of high density with the avoidance of the negative social effects of high-rises and poorly planned high density which the EIS identifies (4.1.1). While "low-rise build out" is a term used in Table IV–1, it does not appear in the text and there is no discussion of design features possible in low-rise construction, which makes it an alternative with potentially important positive effects. The 30–35 du/acre alternative in the text could be townhouses (one design prototype) but also could be one high-rise tower. At 60 + du/acre, high-rises generally become necessary to fit all units on the site. Without information in the text on design, there is no basis for knowing what the writer of the EIS intended or to gauge environmental effects. There is no description of a low-rise, high-density cluster alternative and no comparison of that alternative with the proposed project in terms of sociological or psychological effects. Such an alternative must be considered if the alternative section is to meet the requirements of NEPA.

9. *A mixture of densities and designs.* Table IV–1 compares the mature Cedar-Riverside community as "built out" at four different densities. There is no comparison of these with a mature community comprised of some areas at each density. While the discussion in the text implies such a possibility (i. e. building different stages with different designs and densities) there is no discussion of specifics nor of the environmental effects of such an option. The deposition of Mr. Stein, the HUD official who directed the EIS team, shows that HUD made no attempt to evaluate such an alternative.

10. A number of witnesses testified that different designs were most appropriate for different life styles or stages of the life cycle. The HUD EIS regulations require alternatives to consider the environmental effects of such different populations. Mr. Chester Hartman testified that a mixed density and design alternative was desirable and workable and would allow housing options within the New Town which the present proposal and other alternatives discussed would not. Prof. Cooper testified that she felt such a combination alternative was the best way to build a community open to all persons (e. g. Paragraph 2.2.4.7.-10), and to allow greater freedom of choice through greater variety of design forms. The Metropolitan Council's comments on the draft EIS include a statement that a greater variety of housing should be available in the New Town:

" . . . Stage II proposes one predominate housing type, the high-rise building. This design type has been necessitated by the physical constraints of the site. However, continued reliance upon one housing type in future stages is not consistent with Metropolitan Council, city, or Cedar-Riverside stated objectives for a broad range of multi-family housing types. Furthermore, future stages should also include ownership options for residents such as condominium or cooperatives if feasible. The Council would strongly urge that in the future stages of the Cedar-Riverside New Town more diversity of housing types within a high density setting be included such as townhouses, terrace housing, and low-rise

apartments. These housing developments should, furthermore, include units of sufficient size to accommodate larger families with a range of incomes, and provide ownership options for residents. This may require a re-evaluation of public incentives in order to accomplish."

11. Mr. Jorvig, former executive director of the Metropolitan Council, testifying for defendants, stated that such a mixture was a reasonable alternative. Prof. David Cooperman testified that a reasonable alternative would involve one area at high density for singles and students (perhaps as high as 200 du/acre) and another area at lower density for families with children with low-rise design. Mayor Hofstede's letter to the MHRA and the response of the MHRA Board in accepting his recommendations, show concern for this question among the public policy makers and is evidence that the EIS does not provide an adequate analysis.

12. Such an alternative appears more closely to meet the objectives of the urban renewal plan to insure "heterogeneous population in age, marital status, education, income, and family size" and of the new community project agreement for a "broad range of multi-family housing types" so as to produce a "socially and economically balanced community," than the project as proposed.

13. No rational decision on Stage II can be made without knowing if density/design changes will occur as in a combination alternative. If such a plan with high and low-rise stages or areas were to be pursued, evaluation of the Stage II site to decide if it is a better location for low-rise than others should be done at this point in the development, because of the aesthetic effect of high-rises on the river bluff location.

14. *Ownership Alternatives.* Considerable evidence was adduced as to the environmental implications of ownership of housing as it influences satisfaction of residents, community stability, concern for the environment, maintenance levels and the economic advantages of cooperatives or condominiums for residents. Exhibit 16, a Federal Housing Administration (FHA) memo on cooperatives, strongly reinforces these points.

15. Mr. Kirschner, an expert on cooperative housing, testified that ownership form has definite environmental effects and therefore, different ownership options should be evaluated as part of the weighing of alternatives. The Mayor's letter to MHRA and the MHRA Board response indicated that public officials in Minneapolis considered cooperative ownership alternatives worth investigating. The EIS does not undertake such an evaluation.

16. While Section 4.3 of the EIS is entitled "Changes in Design or Form of Ownership" it is devoid of content; there is no discussion of ownership form in the entire Alternative Section. This total lack of discussion would prevent the decision maker from seriously evaluating ownership options in the decision making process and thus prematurely forecloses such alternatives without investigation as to their environmental effect. Cooperative ownership is allowed by the Urban Renewal Plan and the New Community Project Agreement, was specifically mentioned by the Mayor in his message on Cedar-Riverside alternatives and was suggested by the Metropolitan Council.

17. *The specific combination alternative proposed by CREDF.* CREDF has outlined a specific alternative to carrying out the New Town development presently proposed. This alternative emphasized incremental planning; cooperative ownership; a mixture of rehabilitation and in-fill new housing in the area of the existing community; new high-density, low-rise housing in areas now largely vacant land; a more sensitive treatment of the river bluff area which would preserve public access and the aesthetics of the river gorge; more emphasis on low-income units and units for families with children; a commercial focus on meeting neighborhood needs largely through rehabilitated facilities. Witnesses Cooper and Hartman testified specifically as to the reasonableness and feasibility of the CREDF alternative.

18. This alternative appears to meet public policy goals of intensive usage of the area; eliminating substandard conditions; and providing variety of population, housing design and ownership patterns. It was not considered at all in the alternative section; there was no response to it, nor any acknowledgement that it was made, in the responses to comments in Appendix C. In Appendix F, the response to Mr. Parliament's suggestions for incremental planning is called "meritorious" but the concept is not discussed and nowhere appears in the body of the EIS.

19. *Changes in the Urban Renewal Plan.* There is no discussion in the EIS of the probable environmental consequences of alternative courses of action such as changes in the Urban Renewal Plan. Two paragraphs in the Alternative Section focus on alternative courses of action rather than the type of development they would lead to. None of these is discussed in sufficient detail to be useful in guiding the decision maker, nor are any of the environmental effects of these alternative courses of action explored in any but the must cursory ways.

20. The EIS, paragraph 4.2.1 discusses possible changes in the Urban Renewal Plan. The section is vague and conclusory in so far as it relates to questions of density and institutional demand for housing. There is no discussion of the substance of possible changes or the environmental effects of such changes. In the succeeding paragraph, 4.2.2, there is no discussion of the environmental effects of changes in the Urban Renewal Plan, merely references to the inadequate discussion contained in paragraph 4.1.3.

21. *Financial inability to carry forward the project as proposed.* The EIS gives no consideration to the most probable alternative, the inability to carry forward the project as planned for financial reasons. The Landauer report makes two major points; first, the New Town developer is in serious financial difficulties, second, this trouble centers around the very high cost of land. If those conclusions are correct they must have serious ramifications for the course of redevelopment, but those consequences are not discussed at all in the EIS. The evidence establishes that HUD was aware of such express reservations months before the final EIS was published.

22. Problems with the developer's finances were apparent at the time the EIS was being drafted. The Wiles memorandum shows that HUD was contemplating a take-over of the project in May of 1974. The Landauer report was available to the New Communities administration in October, 1974, immediately after the draft EIS was released, but months before the final EIS was published. The Landauer report indicates that similar conclusions had been previously reached by the New Communities board at an earlier date. This information placed HUD on notice that a change in development entity was a very real possibility; it would have consequences for project timing, planning style, interim management of properties and marketing strategy; that changes in the New Town financing plan, e. g. land write-downs, with implications for the feasibility of alternatives, were almost certain.

23. Sections 4.2.3 and 4.2.4 in the EIS Alternative Section make vague and cursory mention of the possibility that the developer will be unable to continue sometime "in the future." There is no discussion of what to do about that possibility, what the options are, what the consequences of those options would be. This is a completely unsatisfactory treatment of a major alternative in terms of project direction.

24. The Landauer report found the fundamental problems with the Cedar-Riverside project center about the cost of the land, and that the project will not be able to go forward unless land costs are written down. This point was made by CREDF in its written comments and oral comments and the public hearing. There is no discussion whatsoever of land write-downs in the EIS, though there are vague discussions of other possible courses of action such as Urban Renewal Plan changes or substitution of developer entities.

25. Land write-downs would have two types of significant environmental effects. The EIS discussion of land economic factors (paragraph 2.2.2.3(f)), suggests that land costs necessitate high-rise construction. Kirschner's testimony establishes: first, that land write-downs dispose of the question of the economic feasibility of low-rise construction; second, if write-downs were accomplished by use of local tax revenues, it would have a significant effect on the cost/benefit balance of the project as it affects city services and tax revenues. The EIS contains no discussion of land write-downs as they would affect alternatives and cost/benefit analyses.

26. The Landauer report suggested changes in phasing and delays in staging of the project. Many witnesses testified as to the problems that would, thus, be created, yet, there is no discussion of these effects in the EIS.

27. Kirschner testified that the information contained in the Landauer report, which he assessed to be generally accurate, required discussion of a number of alternative approaches to dealing with the situation. He testified that there was no discussion of any of these, and without financial information, there was no way for a decision maker to judge how to perceive or to know the balance between desirable design changes resulting in environmentally beneficial effects versus their economic cost. The Stein deposition and the EIS at F–30 affirmed that the HUD EIS team made no attempt to evaluate the environmental implications of financial infeasibility of the project as planned or of resort to major land cost write-downs.

28. *Rehabilitation.* The possibility of rehabilitation of the properties owned by the developer Cedar-Riverside Associates and the few other property owners in the area was recognized by and adequately treated in the EIS. There is insufficient evidence to conclude that rehabilitation was a feasible alternative which should have been considered further in the alternatives section of the final EIS. HUD does not own the property in question. Cedar-River-side Associates, the owner of a majority of the properties, has already made a decision not to try to rehabilitate its properties. It proposes to replace these old structures with new construction.

B. *The discussion of alternative development possibilities and their effect on the environment is contradictory, conclusory, and misleading.*

1. Mr. Hartman characterized the alternative section as "wholly inadequate" because it is incomplete without explanation of the reasoning underlying statements made, and fails to weigh and compare the environmental costs and benefits of various alternatives. Mr. Kirschner testified that the section was incomplete, confusing and lacking explication of the underlying reasoning process for the statements made, and that an explanation of the reasoning process is "critical" in reviewing alternatives. He also found an absence of real analysis of alternatives' costs and benefits. Both witnesses are professional planners with experience in the planning of housing and redevelopment projects and the evaluation of alternative proposals for housing development. Prof. Cooper testified that the absence of balancing of cost and benefits of particular alternatives made a reasoned choice by the subsequent reviewer impossible. She noted a method for comparison of social and psychological effects of housing design that would be appropriate, citing the figure from the Leibman article attached as an appendix to the CREDF comments on the draft EIS.

2. *Table IV–1, the only attempt quantitatively to compare differing effects of alternatives, is incomplete and lacking in discussion of the underlying basis for the values shown.*

3. Hartman testified that Table IV–1 is the only attempt to quantify differences among alternatives and that it was inadequate, confused in its presentation and that no indication of the basis for the numbers was provided. Alternatives in the table do not correspond to those discussed in the text. Rehabilitation appears in the table,

but not in the text. The third part of the table, Stages III–X includes only the Title VII proposal and not the four alternatives which were part of the other two table sections. It appears that one third of the table was inadvertently omitted.

4. Mr. Kirschner's testimony stressed the necessity of a quantitative or semi-quantitative matrix comparison of the differential effects of alternatives on a range of environmental variables. He also pointed out the table and text do not correspond; rehabilitation is mentioned in the table, but not discussed in the text, and the option of moving the site of Stage II is discussed in the text, but not compared to other alternatives in this table.

5. The comparisons appearing in the table do not present raw numbers and there is no description of the way the fractions used for comparison purposes were derived. There is no explanation as to why the relative impact of a 60–80 du/acre mature project and a 30–35 du/acre mature project should decline from .4 to .2 for electrical use but decline 50% more from .5 to .2 for steam use. Nor is any reason given that the relationship (for the above two alternatives) for water use should be .2 and .5 in the mature new community but .3 and .6 in Stage II.

6. With respect to traffic levels shown in the table, they are representative only of straight line population differences for each alternative and do not purport to predict traffic which will occur in the Cedar-Riverside area. Mr. Downs, defendant's expert witness, was unable to determine from the table whether it represented total traffic or only traffic generated by the housing project, and was, thus, unable to determine if traffic would vary in a straight line fashion with housing density, since at lower densities more individuals working or attending school in the area might be forced to commute by automobile. The HUD EIS team calculated these inter-relationships on a linear, straight line basis and thus, the reasons for the above inconsistencies are not ascertainable.

7. Mr. Hartman noted that no rationale was given for the choice of the six environmental variables used in the table. It was his opinion that the six (water, sewage, solid waste, electricity, steam, traffic) represent an inadequate range of probable environmental effects. For example, domestic water consumption, sewage and solid waste will be the same for the given population regardless of where situated. Locating all the population in Cedar-Riverside raises only the question of the adequacy of the existing sewer and water lines to handle these high populations, and no materially different environmental effects on a system basis will result. With respect to traffic, only a straight line assumption regarding traffic generated by the project is made. No evaluation is given of carbon monoxide levels and the overall level of traffic in the project area. The table, assuming a straight line relationship as to electricity and steam use gives no indication of possibly better energy conservation performance of differing alternative designs.

8. The inadequacy of analyzing these environmental effects is illustrated by noting some of those omitted, such as: the relationship between design and social-psychological satisfaction with housing, open space adequacy, appropriateness of the unit size and income level in meeting regional housing demands and air pollution.

9. *The characterization of alternatives solely in terms of gross densities is not descriptive enough to allow their comparison as to important environmental effects.*

10. Mr. Hartman, Prof. Cooper and numerous defense witnesses testified that paragraphs 4.1.1 to 4.1.4 and paragraph 4.3, which involve altering the character of development in various stages, presented alternatives incapable of thorough evaluation because the alternatives are described only in terms of densities (or in paragraph 4.3 in terms of "changes in design") without further details. Absent a description of the design elements most closely related to environmental effect, no evaluations can be made.

11. Other witnesses supported these conclusions. Mr. Engelen, Ms. McFall and Mr. Broun testified that gross density figures gave an incomplete description of important characteristics of housing. Mr. Jorvig testified that one could not predict differences in amounts of open space between developments of different densities without knowing more detail about building heights and the size of units. Mr. Rapson, the Project Architect, stated that simple density figures were not nearly enough to understand environmental effects. Prof. Cooper testified that gross density figures would not allow conclusions as to effects on the social environment, nor comparison among alternatives as to these effects.

12. Prof. Cooper has studied and compared the actual functioning of a number of different types of housing developments. She testified that consideration of alternative designs is "absolutely essential" in evaluating social-psychological effects of housing, the relationship of housing to open space and the suitability of housing for different populations. It appears impossible to compare such effects of a 30–35 du/acre project to those of a 60–80 du/acre project without information on design details. Design can vary within a given density; at 60 du/acre, high-density, low-rise is possible or several high-rise towers; at 35 du/acre, a single tower or low-rises can be built. Such comparison could be by a table or matrix with discussion and balancing such as the illustrative figure shown in the Liebman article attached as an appendix to the CREDF comments.

13. Some of the design features most important to such a characterization of alternatives are number of stories, number of units per floor, placement of entrances in relation to common space, number of units per entrance, availability and location of private or semi-private open space. Prof. Cooper stated that preliminary site plans with details as to the form of entry, kind of open space and treatment of common space and facilities would be necessary.

14. Witnesses Cooper, Rapson, Engelen and Kirschner all testified that the development of such alternative preliminary site plans is practical, economically feasible and a normal part of the planning process. Such preliminary site plans and a description of building design elements are necessary to evaluate alternatives and allow a reviewer to know what the alternative will be and its effects. Mr. Rapson indicated such site plans for alternatives and models or schematic drawings of housing design were necessary to give government officials an idea of alternatives and what was planned. Here such details and plans are necessary for each major prototype and several combination prototypes. There are no such prototypes presented to the decision maker for the consideration of alternative environmental impacts in this EIS.

15. *The unsupported assumption made throughout the EIS that the findings of The Cost of Sprawl generalize automatically to the Cedar-Riverside New Town carries through to the alternative section. Resulting statements as to the effect of alternatives on energy use and air pollution are conclusory and misleading.*

16. Assertions that development of Cedar-Riverside at a lower density would increase overall traffic, air pollution and energy consumption pervades the discussion of alternatives. Although unsupported and unexplained in the text of the alternative section, these assertions presumably result from assumptions that the finding of the report, *The Costs of Sprawl*, apply to the Cedar-Riverside case.

17. It is questionable whether *The Costs of Sprawl* findings apply to all; testimony indicated that the conclusions therein are not related to a project density in a simple linear way. Mr. Downs testified that considerable calculation would have to be done to apply the results found in *The Costs of Sprawl* to a specific project in a concrete way.

18. There is no explanation of the underlying basis for assertions about relative energy consumption among alternatives. Relative energy consumption is a variable of important environmental consequence and the alternative section of the EIS is

inadequate on this ground. Mr. Stein's deposition shows that no attempt was made critically to evaluate energy use by various alternatives, nor to extrapolate *The Costs of Sprawl* to possible alternatives.

19. *The Comprehensive Open Space Plan, Appendix D, conflicts with the proposal for the Stage II–B site which is partially the subject of this EIS. Section 4.1.3 exemplifies the "inadequate" nature of the alternative section by failing to compare and evaluate these conflicting proposals for the II–B site.*

20. The Comprehensive Open Space Plan (COSP) indicates that the river bluff neighborhood park will be located below the crib wall in an area which conflicts with the proposed location for the Stage II–B housing. In the alternative section, paragraph 4.1.3, there is no discussion of the removal of the Stage II–B housing because of an alternative open space use. The EIS states: "The impacts might be even worse if, for example, development were relocated from the Stage II–B site." The open space plan calls for adding two to three acres in the river bluff area and appears to conflict with the construction of four hundred and fifty units on the 3.6 acres in the II–B site. This should have been the subject of careful evaluation in the alternative section.

21. *Discussion of alternatives is generally conclusory and lacking in the rigor necessary for realistic comparison of alternatives as part of a sound decision making process.*

22. Testimony with respect to specific paragraphs of the alternative section of the EIS indicated the absence of a thorough explanation of conclusions and a rigorous comparison of environmental effects. In paragraph 4.1.1 benefits and costs cited for the lower density alternatives appear to be arbitrarily selected and stated as fact without explanation of the underlying reasoning. There is no attempt to weigh the factors, no calculus as to the costs and benefits and therefore no basis for reaching a conclusion as to the desirability of the alternative.

23. Paragraph 1.2 is incomplete. Characterizing the environmental effects of a change in density to 60–80 du/acre rather than the 30–35 du/acre discussed in paragraph 4.1.1 as "similar but to a lesser extent", is too vague to be meaningful. The alternative sites and the costs and benefits discussed for them in paragraph 4.1.3 all seem arbitrarily selected; there is no specification of the reasons for the selection; there is no discussion of relative costs and benefits.

24. Paragraph 4.1.4 is without meaningful discussion. Paragraph 4.1.5 contains a discussion which is not relevant to a comparison of alternatives.

C. *The range of environmental variables considered in examining alternatives is not broad enough to allow a full analysis of each alternative or a meaningful comparative evaluation of the environmental effects of each.*

1. The EIS Alternative Section fails to consider a number of significant environmental effects which vary with different alternatives. Absent such a discussion and comparison, no decision maker can evaluate the desirability of the project as proposed or the various alternatives.

2. *The social and psychological effects of physical design and ownership.* Numerous witnesses testified as to the importance of such considerations as: population groups that would be attracted to the housing, levels of satisfaction likely to result, development of proprietary concern, existence of barriers to feelings of community and creation of excessive friction among residents. There was general agreement that these were important environmental considerations. Some specifically mentioned the importance of these factors in comparing alternatives. Prof. David Cooperman wrote to the HUD consultant on social concerns that social impacts of alternatives should be evaluated and that he assumed someone on the EIS team was doing so. Prof. Clare Cooper felt it "absolutely necessary" that alternatives be compared and evaluated in this way. Mr. Hartman testified that an adequate Alternative

Section would have to discuss these effects. Mr. Kirschner found the Alternative Section inadequate because effects of ownership, with implications for the social and physical environment, were ignored.

3. *Meeting community housing needs.* Table II–5 in the EIS compares the Cedar-Riverside development proposal to the Metropolitan areas housing needs by rental costs and unit size. The text declares that the development "proximates" regional housing needs. This is not the case as to larger units and as to low income units. Mr. Jorvig's testimony established that a project providing 10% units with three or more bedrooms would not "proximate" the regional demand of 32% for such units. The Cedar-Riverside project proposes only 9% of such larger units.

4. The Landauer report stated that the developer's proposal was not meeting the demands for subsidized housing and was placing too much emphasis on market rate housing. While the table itself might alert a decision maker to a problem in this area in spite of the inaccuracy in the text, the weighing of the environmental effects of the performance of different alternatives in this regard is also required.

5. The extent to which alternative development proposals meet the city and region's most pressing housing needs should be an important factor in comparing alternatives in the EIS. The testimony indicated that the two most pressing needs were for larger units and for low income units. The testimony pointed out the inadequacy of the Alternative Section as to this issue and showed its particular importance in view of the undersupply of low income and larger units in the New Town proposal.

6. The deposition of Mr. Stein showed that the HUD EIS team gave no consideration to this question in evaluating alternatives.

7. *Demographic effects on the city and the extent to which alternatives achieve the goal of a balanced, mixed community.* These issues do not enter into the EIS evaluation of alternatives. Further, there is no description of or data on the population that the various alternatives are designed to serve and thus the EIS provides the decision maker with no projections as to important characteristics of the social environment. The testimony established that differing housing designs would attract different population mixes, thus an evaluation of the consistency of such a resident mix with the urban renewal plan and project agreement goals is necessary; that different populations also will have different effects on certain other environmentally related factors such as transportation and associated carbon monoxide was also made clear in the evidence.

8. *Public Costs and Benefits.* Witnesses Kirschner and Hartman testified that the effect of a large scale redevelopment project on public agency budgets was a significant environmental concern not addressed in a rigorous way in the EIS generally and not addressed at all in the Alternative Section; that these effects are directly related to the availability and uses of resources, and the level and distribution of services of public agencies. Prof. Cooperman in his letter to Sharon Fitzsimons, the HUD social consultant, also suggested that a far more rigorous and uniform treatment of the effect of alternatives on public service budgets was necessary.

9. There is no comparison of alternatives in this regard and there is inadequate information in the remainder of the EIS to allow a decision maker to make his own projections and comparisons. In the several places in the EIS that deal with matters requiring public expenditures due to the New Town community, none provide cost estimates with the exception of those dealing with police and fire protection costs. The testimony showed that the EIS conclusion that the project will have "minimal" effects on city services is conclusory and probably inaccurate. Kirschner predicted that the project will have a significant effect on the level of city services required and that it was possible that the net effect of the project on city revenues would be negative. Particularly would this be true if city tax increment revenue was necessary

for land write-downs. He testified that there was no way, accurately, to predict this from the EIS.

10. Mr. Stein's deposition shows that there was no attempt by the HUD EIS team to compare alternatives as to these costs and benefits. There was, further, no attempt to evaluate the effect of necessary land write-downs on city revenues although this would have a major impact on the net project effect on city costs versus revenues.

11. *Cost of Resources and Materials.* The testimony supported the conclusion that high-rises are more costly structures to build than low-rise apartment buildings, on a per unit cost basis, even considering the distribution of a fixed land cost over more units with high-rise. Data in the report *The Costs of Sprawl* supports this conclusion. Mr. Downs, defendant's witness whose consulting firm prepared the report, agreed that high-rises were significantly more costly to construct than low-rises. Investment in housing represents the irreversible and irretrievable commitment of scarce resources. The cost of those resources relates directly to the cost residents must ultimately pay for shelter. It is, therefore, a significant environmental effect. There is no attempt to compare alternatives on this basis.

12. *Open Space.* There is no evaluation in the Alternative Section with respect to the Stage II—river bluff area of the relative desirability of the Stage II area for open space uses or of alternative housing configurations in the Stage II area and their relationship to river front aesthetics and open space access.

13. Generally, with respect to both Stage II and the project at maturity, there is no comparison of open space needs of different populations that would be housed in different alternative types of housing, the different open space needs that would result from housing alternatives which have significant adjacent private or semi-private open space (as contrasted to the proposed high-rise development without such open space), or the adequacy of specific acreages and locations of open space possible in the proposal vis-a-vis differing alternatives.

14. Open space is a critical environmental concern. Failure to indicate the effects of various alternatives to the project on open space is a most significant and material inadequacy of the impact statement Alternative Section. Any decision made without such information would be arbitrary and capricious.

15. With respect to open space in the Alternative Section, the conclusion in paragraph 4.1.1(b)(4) is not substantiated by any discussion of the underlying basis for that assertion. Testimony showed that the reduction in psychological and social tensions alluded to would only occur if the open space were increased by creation of private or semi-private open space which was usable to residents rather than undifferentiated open space. The conclusion at paragraph 4.1.3 that the relocation of Stage II would "possibly increase the amount of open space in Cedar-Riverside" constitutes a most cursory treatment of the value of such relocation particularly in light of the conflict between the II–B housing site and the neighborhood park space identified in the COSP.

D. *The discussion of alternatives in the EIS fails to compare and evaluate the costs and benefits of reasonable alternatives as required by NEPA and HUD regulations, and therefore, fails to provide a basis for decision making.*

1. Mr. Hartman testified that an adequate comparison and evaluation of alternatives requires: (1) a method for measuring the effect of each alternative on each environmental variable, (2) a comparison of the relative effects of each alternative on each variable, (3) a method of weighing the importance of different environmental effects and (4) the balancing of costs and benefits of each alternative. He testified that in the absence of such a cost/benefit calculus there is no basis for the drawing of conclusions. Prof. Cooperman discusses a method for such a comparison as to existing services in Exhibit 19. Section by section and

in total the EIS discussion of alternatives fails to weigh factors, compare costs and benefits and compare differential effects of alternatives on environmental variables.

2. Mr. Kirschner testified that such quantified or semi-quantified case by case balancing is necessary for making judgments; that Table IV–1 is a wholly inadequate attempt at such a weighing and balancing; that the attempts which are made to quantify effects are all on a gross basis rather than on a per unit basis, thus allowing no meaningful comparisons.

3. Mr. Broun testified that a cost/benefit weighing of environmental advantages and disadvantages of a proposal in order to make a quantitative or semi-quantitative assessment of net effect is necessary for decision making.

4. The deposition of Mr. Stein shows that the HUD EIS team made no attempt quantitatively to evaluate the effect of alternatives on environmental variables such as auto use or air quality, to do a cost/benefit assessment of any alternative or to rank environmental effects in any order of importance. Without such weighing and balancing, informed decision making is impossible and the Alternative Section is inadequate on this basis.

E. *Responses to comments which relate to alternatives are incomplete, cursory and inaccurate. Reasonable alternatives suggested in comments which would have environmental effects significantly different from those of the project as proposed are not considered in the EIS.*

1. Written comments of the Environmental Protection Agency suggested: "Because of adverse impacts on air quality, the final EIS should evaluate alternative designs that would reduce the number of trips." It also suggested: "The alternative of placing the parking facilities on the periphery of the development should be investigated".

2. Responses appear in the EIS at C–13 through C–16. There are comparative lengthy responses to all points raised by the EPA except these two suggestions. There is no discussion of the possibility of alternative designs or peripheral parking in the EIS response. The Alternative Section does not discuss any alternative in terms of quantitative difference in trip generation and air pollution levels. The Stein deposition shows that no such studies were conducted by the HUD EIS team.

3. Testimony of Roy Mann, landscape architect, specifically urged the alternative treatment of the river bluff and bluff crest as open space. This suggestion was based largely on concern for preservation of the character of the river gorge and his belief that open space is inherently the best use for the bluff and bluff crest. The response is that there will be open space in the bluff area. This was not an adequate response and raises doubts to the comprehension of his comments by the drafters of the EIS.

4. Mr. Kirschner testified at the public hearings as to the social and economic advantages of cooperative ownership as an alternative for Cedar-Riverside. The response was that Kirschner overstated the case for the advantages of co-ops and cited a HUD supported study to this effect. Kirschner testified at trial that this was an inadequate and misleading characterization of the study. It found in fact, significant advantages to cooperatives in the areas of tenant stability and maintenance cost. A HUD memorandum based on the study supported this contention. No discussion of cooperative ownership appears in the EIS text.

5. John Cann, representing CREDF, testified at the hearings as to the necessity of an alternative course of action by HUD to resolve the development's financial crisis. This alternative proposal involved writing down the cost of the land by about 50%. The response was that the proposal was not within the purview of the EIS.

6. Comments on the draft EIS contained many proposals as to alternative density, design and ownership forms and the positive environmental effects of these changes. These suggestions received no reasoned, ob-

jective response. Responses to the comments ignored the alternative proposal altogether in several cases. Other responses referred simply to the developer's purported efforts. No alternative suggestion was responded to adequately and none were reflected in the content of the EIS Alternative Section.

III. THE EIS IS INADEQUATE AND DOES NOT COMPLY WITH NEPA BECAUSE IT IS NOT A FULL, FAIR AND ACCURATE DISCLOSURE OF ADVERSE AND ENVIRONMENTAL EFFECTS OF THE PROJECT.

A. *The discussion of air quality in the EIS presents a misleading and inaccurate projection of potential health endangering levels of carbon monoxide and other pollutants in an area with admittedly "marginal" air quality.*

1. Mr. Madole, a staff member of the Minnesota Pollution Control Agency, Division of Noise and Air Quality, with responsibility for issuing indirect source permits, testified that he would not issue an indirect source permit for the proposed Stage II of the Cedar-Riverside development. This was based on his estimation that the projections in the EIS for future carbon monoxide pollution in the Cedar-Riverside area were extremely conservative.

2. The discussion of local air quality in Section 2.2.3.2.4 of the EIS appears misleading. The section states, in part, that while the Cedar-Riverside area is one in which relatively high concentrations of carbon monoxide could be expected, that in future years, projected auto emission controls should reduce the problem. Mr. Madole testified that auto emission controls would not reduce the problem of carbon monoxide pollution caused by cold starts of automobiles, and by stop and go traffic in the Cedar-Riverside area. He considered these to be the major sources of carbon monoxide pollutants in the localized area of Cedar-Riverside. The Section also indicates that the city of Minneapolis is implementing a plan approved by the EPA to reduce carbon monoxide levels in the downtown area to within *federal standards by 1976*. Mr. Madole testified that it is his opinion that this plan will not be achieved by the City of Minneapolis by 1976.

3. The statement in Section 2.2.3.2.5 of the EIS, that the "centralized character of Cedar-Riverside leads to a more efficient use of energy and less per capita pollution than is the case with typical residential neighborhoods," ignores the serious problem of potential localized high concentrations of carbon monoxide and other pollutants. While the per capita pollution could decrease, a critical factor is whether localized areas of the city will become so polluted as to be dangerous to the health and safety of residents. Mr. Madole testified that serious health consequences can result from carbon monoxide levels exceeding to any extent the carbon monoxide standards. These standards apply to specific localized areas of heavy congestion where carbon monoxide levels could exceed the minimum standards for public safety.

4. Section 2.2.3.2.6 of the EIS is misleading in its implication that the Minnesota Pollution Control Agency has the authority to enforce air quality standards in the interior of buildings. The EIS there states that "as the highest indoor concentrations occur during the night, when all residents are in their apartments, it creates a living environment of low quality," and implies that the MPCA has authority to insure that the indoor air quality levels will be monitored and controlled if such becomes a serious health hazard. Witness Madole testified that his department has no authority over indoor air quality. The EIS would present a more accurate picture to a subsequent decision maker if, after saying that the levels of sulphur dioxide and carbon monoxide within the apartments in Cedar-Riverside create a "living environment of low quality," the EIS stated candidly that there was nothing known that any state agency could do to correct the problem.

5. The testimony indicated that the discussion in the EIS of meteorological factors which affect air quality was inadequate;

that it failed to discuss the effect of temperature inversions on the air quality in the Twin Cities (a factor which has major impact) that the section (2.2.3.2) gave a wind speed higher than the wind speed in the downtown areas. This gives a misleading impression as to the cleansing effect of high winds.

6. In the EIS various distributions and projected distributions of carbon monoxide pollutants are described in the form of three schematic diagrams. These schematics are taken verbatim from a report on air quality in the Cedar-Riverside area prepared by Richard Thullier, air pollution consultant to the developer. In the text of the report, the author warns the reader about these schematics:

"Because of the many estimates, assumptions and judgments involved in preparing these distributions, *extreme caution should be used in their interpretation.* They are best regarded as semi-schematic illustrations of general carbon monoxide variability in the project area and are in no way indicative of precise gradients or point values."

(Emphasis in the original)

These schematics reproduced in the EIS contain a note the "plot is semi-schematic and values (estimates) are not representative of precise point locations." The other cautionary language of the Thullier report concerning the *extreme caution* which must be used in interpreting the figures is absent from the schematic and from the text of the EIS. The omission of this cautionary language is a serious one, and is such as to prevent a subsequent decision maker from understanding the underlying reasoning process that lead to the development of the schematic representing projected carbon monoxide levels, and from evaluating the potential for levels of carbon monoxide in excess of those shown in the diagrams.

7. The EIS contains no independent evaluation of the air quality levels which will result from the development. State and federal standards are cited throughout the discussion of air quality, but no independent assessment or balancing occurs in the EIS as to the severity of the air quality problem and whether an alternative with less serious air quality impact is preferable even if state and federal standards are met.

8. The discussion of air quality in the EIS is misleading; all of the errors and omission tend to lead a reviewer of the EIS to the conclusion that the air quality problems in Cedar-Riverside although marginal, are well within the range of manageability. Testimony of the responsible officer of the state Pollution Control Agency indicated that this was not the case. He testified that the serious air quality problems now extant in the Twin Cities will be exacerbated by the location of a very high density residential development with concentrated carbon monoxide problems at the Cedar-Riverside location. The inadequacy of the EIS misleads a reader to the conclusion that the problem is less serious than the testimony established.

B. *The EIS provides an inadequate and misleading discussion of the potential danger of fire in the Stage II portion of the proposed Cedar-Riverside project.*

1. The evidence indicated that a combination of factors makes the danger of fire in the Stage II portion of the project a serious and material environmental risk. Access to the housing site is severely limited for fire fighting equipment and traffic congestion in the general area could seriously delay arrival of fire fighting equipment during peak traffic periods. The height of buildings is in excess of accessible levels with presently available ladders and, most importantly, the buildings will not be completely sprinklered. There is no evaluation of the increased danger of fire occasioned by a high percentage of children in the Stage II portion of the project. This subgroup of the population seems both more likely to start fires and to be the victims of fires. Evidence adduced at trial indicates that these concerns are real and significant. The Minneapolis Fire Chief maintained that complete sprinkling of the building was necessary to provide proper fire protection.

2. The EIS discussion of the danger of fire is conclusory and unsupported by any discussion of the underlying basis for the assertion that the danger is minimal. The representation that the Minneapolis fire authorities were satisfied with proposed partial sprinkling systems is contradicted by the Fire Chief's letter. There is no discussion of the relationship of the extensive child population to fire danger. The misrepresentations here would lead a subsequent decision maker to underestimate the severity of this environmental concern for the project as proposed and provide no basis for evaluating the performance of alternatives with respect to fire safety.

C. *The discussion of energy consumption by the New Town is inadequate because it incorrectly characterizes energy requirements as "minimal" as compared to alternatives and the discussion depends heavily on unexamined assumptions regarding the applicability of The Cost of Sprawl study. Specific energy requirements and efforts at energy conservation were not examined for the proposed Stage II as compared to alternative project designs.*

1. The EIS concludes as regards energy consumption of the project at maturity that energy requirements are "minimal as compared to what they would be for alternative forms of development" and "Cedar-Riverside will save energy on a per unit consumption basis" (Section 2.2.1.3.5.) The EIS further concludes that "increased energy requirements should be less for Cedar-Riverside as compared to other forms of development, according to *The Costs of Sprawl* report." (Section 3.1.2.)

2. This basic conclusion, that the high density development proposed for Cedar-Riverside results in an overall reduction in energy consumption, is based on the report *The Costs of Sprawl* according to the deposition of Mr. Stein. This conclusion is highly suspect.

3. The high density community studied in *The Costs of Sprawl* is actually a relatively low density community. "High-rise" housing in the study was built at 30 du/acre as contrasted with 125 du/acre proposed for Cedar-Riverside. The "high density planned community" in the study was built at 19 du/acre! The developments in the study were new developments on the suburban fringe rather than central city redevelopment. The testimony of Mr. Jorvig, a witness for defendants, illustrated how misleading the reference to "high density" in *The Costs of Sprawl* as used in the EIS can be. He mistakenly assumed that a project similar to Cedar-Riverside at maturity was the energy conserving high density project cited in the report.

4. Mr. Kirschner, plaintiff witness with special expertise in the area of energy use, indicated that the EIS' application of *The Costs of Sprawl* findings to Cedar-Riverside are not justified by data in that report. It rests upon the assumption that no other near-job housing opportunities are available, that project residents will shift to high public transit use and ignore the decreasing energy efficiency of building design as greater density requires high-rise elevator structures. Significantly, there was no analysis of actual transportation demands of the Cedar-Riverside population in the preparation of the EIS.

5. The Minnesota Public Interest Research Group (MPIRG), in their written comments, pointed out that it was invalid to assume without analysis that the specific population of this project, in significant part students and heavy users of public transit, will drive significantly less because they moved to Cedar-Riverside. No evaluation of this valid question was made.

6. The general assumption of ability to apply the findings of *The Costs of Sprawl* to the Cedar-Riverside project is disproved by an evaluation of specific effects that occur as densities increased. The construction cost trend shown in *The Costs of Sprawl* in the 19 du/acre high density planned community and the 30 du/acre high-rise building type are assumed therein to continue as densities increase beyond those levels. The testimony established that such is not necessarily the case. A

major component, the cost of the buildings, decreases on a per unit basis with increasing densities up to walk up apartments. As density progresses further to high-rise construction, the trend reverses because of the necessity of Class A construction and cost per unit then increased with increased density.

7. Another example, directly in point on energy use, of the fallacy of assuming the application of *The Costs of Sprawl* findings is with respect to the potential of the housing development for generation of automobile trips on a per unit per day basis. The HUD EIS expert consultant on air quality showed in his study that while per unit per day automobile trips do fall off as density increases, this effect diminishes in significance at 30 du/acre. Beyond that point, there is no significant reduction in the per unit per day auto trips generated and the energy per unit consumed by transportation. Thus, important trends measured in *The Costs of Sprawl* do not necessarily continue indefinitely with increasing density. Evidence has shown that the results of the study are of dubious application above about 30 du/acre. In the absence of a specific evaluation the assertion of the EIS regarding the applicability of *The Costs of Sprawl* is highly misleading.

9. Mr. Stein's deposition indicates that the assumption *The Costs of Sprawl* applies to Cedar-Riverside was made by the HUD EIS team "just on a gross basis", "high density is generally more efficient and more economical than sprawl", and that no actual evaluation was undertaken of auto use by residents of a project such as Cedar-Riverside compared to those explained in the study.

10. The actual projections of energy use by the project show that the proposed high-rise, high-density development is an inordinately high energy user. Kirschner demonstrated that the table projecting energy use for the mature project, Table II–19, contains an arithmetic error which would indicate that the projected total kilowatt hours of electrical energy used in the mature project would be 20% less than the correct

addition of figures in that column indicate. This arithmetic error is repeated throughout the discussion of energy use to substantiate claims that the project is a low energy use project.

11. Mr. Kirschner showed that the statement in the EIS, Section 2.2.1.3.5 that approximately 35% of the increase of energy requirements over the 1970 level in the Cedar-Riverside area is attributable to the New Town development is inaccurate; that using the figures in the tables immediately preceding this paragraph, the development will actually account for 80% to 85% of the increase. Defendants conceded these inaccuracies and their correction.

12. Mr. Kirschner testified that the mature project energy use per unit, as calculated in the EIS, is much greater than that of the average residential home in Minneapolis. Testimony of Mr. Stein affirmed that extremely heavy per unit energy use was an accurate prediction of expected normal energy use of the project at maturity.

13. The EPA in its comments on the draft EIS stated:

"Architecture within the development should express energy conservation measures to minimize heat requirements during the winter and reduce the needs for air conditioning during the summer. The orientation of the building with respect to seasonal variations of sunlight and prevailing winds should be discussed. Measures to conserve energy should be evaluated such as insulation, fresh air circulation, and the use of balconies to shade south and west sides of the building to reduce direct sun light during summer yet allow direct sunlight during winter."

The Stein deposition shows that the HUD EIS team made no analysis of the design and siting of Stage II with regard to energy use or of alternatives which would improve the energy conservation performance of the project.

14. The inaccuracies and short-comings of this section of the EIS are especially flagrant in light of the comments received on the draft EIS. Notice was given by the comments that energy use by the project

was not properly analyzed in the draft and was of serious environmental concern. Mr. Broun, the HUD official with overall responsibility for environmental impact statements, testified that this circulation for comment and review is the "heart" of the EIS process.

15. The response to the EPA is a very brief description of energy conservation measures in Cedar Square West, Stage I of the project, with no mention of Stage II. The response to MPIRG comments is simply that MPIRG is wrong, without discussion. The response to CREDF is a quotation from *The Costs of Sprawl*, the thrust of which is that denser developments have lower demands for energy than single family homes. Such responses fail to meet the requirement for full disclosure and evaluation of environmental effects.

16. The inaccuracies in the discussion of energy use in the proposed project fall on the conservative side, leading a decision maker to the conclusion that the project will have a minimal effect on energy demands compared to alternative design, whether in terms of changes in density or in terms of specific changes in building construction technique or alignment. This section does not alert the reader to the very high energy demands of the project at maturity and thus fails to disclose a major adverse environmental impact of the project. It weights the scale improperly in the consideration of alternatives.

D. *The Environmental Impact Statement fails adequately to disclose in sufficient detail the environmental effects of the project as they relate to open space.*

1. The open space sections in the Environmental Impact Statement are inadequate to present the decision maker with information on the effects of the proposed project on the environment in terms of open space.

2. There is no discussion or evaluation of certain problems raised in the Mann testimony. There is potential for material adverse effects from these problems. Unless information and data on each is presented,

the decision maker lacks information to make a decision or determine the severity of the problem and adequacy of the proposed open space. The problems include: (a) the adequacy of Van Cleve Park as a community park for Cedar-Riverside; (b) the noise and vibration effects on Sixth Ward Park in light of the EIS's stated policy against recreational facility location near the freeway; (c) Neighborhood versus Metropolitan park use of the river front; (d) the failure to specifically identify and reserve open space in the area to prevent approval of housing on needed park sites; (e) the lack of evaluation of the effect of no back yards on open space needs and; (g) the lack of any demographic evaluation of open space needs.

3. There is no evaluation of the effect that the Stage II structures would have on the river bluff environment caused by the height of the buildings, the lack of set-back of buildings and the access to public open space from the river. In view of the testimony of Mr. Mann at the hearing on the draft EIS with respect to the effect of buildings on river front open space aesthetics the absence of any discussion in this area is surprising. The paragraph describing the Mann testimony (F–16) fails to indicate the underlying reasoning expressed in Mann's concerns and prevents a reasoned observer from understanding the concerns. The EIS should have contained an evaluation of the *height* of the proposed project. Nowhere in the EIS is there an indication of the actual height of buildings or of their spatial relationship to the adequacy of the set-back from the Mississippi river bluff. Testimony of Mr. Mann indicates that the height of the buildings, as he understood the proposal, would tend to dwarf the bluff landscape feature and diminish its aesthetic value.

4. In order adequately to consider these areas, the EIS would have to discuss the beneficial and adverse effects related to (1) building heights at their particular location on the bluff, (2) the set back of buildings from the bluff or the consideration of a "zoning envelope" approach with lower buildings at the bluff and higher buildings

back from the bluff, and (3) the adequacy of access for individuals to the river edge open space through the area of development at the top of the bluff. The EIS fails to entertain these considerations.

5. The EIS fails to consider the potential value of the bluff area as open space and estimates its worth only in terms of its existing lower grade industrial use. Such failure to consider the environment as restored to its fullest potential is misleading and fails to recognize a duty to implement the Congressional policy expressed in NEPA § 101(c) "to contribute to the preservation *and enhancement* of the environment." (Emphasis supplied).

6. The EIS, paragraph 2.2.2.3 fails adequately to discuss the effect of the project in terms of its design on the river corridor or to represent the state of the arts with respect to urban design. It implies that there is a concensus of professional opinion that the aesthetics of the project would be "pleasing" to design professionals. The testimony indicates that there is no such concensus and that the proposed sky-line would be "distracting, disorganized and confusing, both to residents of the proposed community and to observers from the valley bottom or the opposite bluff".

7. Mr. Mann testified that the proposed Stage II–A and II–B design causes an environmentally undesirable effect in terms of river aesthetics because of its failure to have adequate set-backs and to have the structures rise in successive tiers gradually with distance away from the river so that the buildings do not dominate the river landscape and subordinate river landscape values.

8. There is no evaluation of the effect of the proposed project in appropriating community or metropolitan open space along the river's edge as can occur when tall buildings adjacent to an open space area either prevent access and create a sense of proprietary holding by the occupants or how such tall buildings, by increasing the density of population and the competition for open space, exclude use by the larger community.

9. The EIS in discussing the Comprehensive Open Space Plan for Cedar-Riverside (paragraph 2.2.1.21.7) contains no discussion of the underlying reasoning process used to determine that the open space plan provides "adequate" park and recreation open space facilities and programs or "adequately provides the vehicle for realizing the public private objectives for Cedar-Riverside open space and recreational needs." There is no discussion of the underlying reasoning which leads to the EIS conclusion (paragraph 3.2(c)) that "compliance with this [open space] plan should adequately avoid adverse impacts".

10. Neither a layman nor a landscape/open space professional could gain sufficient information from reading the EIS to make a determination as to the environmental effects of the Cedar-Riverside project on open space, because the statement fails to address itself to the specific demographics of the project and the open space needs of the expected population.

E. *The EIS discussion of the project's housing type and design relative to resident demographics is contradictory and misleading and is not a full disclosure of possible negative environmental effects, nor an adequate foundation for decision making and the evaluation of alternatives.*

1. The evidence indicates that the major population trend affecting Minneapolis since the 1960 census is the decrease in number and percentage of households with children and the increase in number and percentage of smaller households without children and largely composed of single people.

2. The size of the units and the physical design generally proposed for Stage II and future stages of the Cedar-Riverside New Town will encourage that trend to continue in the project area. Gerta Werkele, a sociologist whose work is cited in the EIS, testified at the public hearings on the draft EIS that single people and childless couples

are those who are attracted to high-rises and for whose needs and life styles high-rises are well suited. The New Town as planned and as characterized by Cedar Square West is an adult oriented development. The EIS (paragraph 2.2.4.7.3) recites that nearly three quarters of Cedar Square West households are composed only of adults. Mr. Downs stressed the adult oriented nature of the New Town. Mr. Engelen testified that families with children who could afford to live elsewhere would not move into Cedar-Riverside. The survey of Cedar Square West residents conducted by Prof. David Cooperman showed that the vast majority of residents felt that the complex was not suited for families with children. The EIS states that future stages will have to be even more adult oriented if the projected child population of only two thousand (out of 25–30,000) at maturity is to be met.

3. The EIS, defendants' trial testimony and written comments on the draft EIS characterized this as a positive effect; the thrust of defendants' explanation is that the New Town housing will be meeting a demand for adult oriented housing in the most appropriate setting (high-rises) thus providing the best center city environment for these households while relieving market pressure from other neighborhoods more suitable for family oriented housing. However, the Urban Renewal Plan demographic objective is to insure a "heterogeneous population in age, marital status, education, income and family size." The New Community Project Agreement calls for a "socially and economically balanced community" serving "persons with a full range of family incomes, sizes and interests." There is no analysis of this apparent conflict in the EIS, nor a recognition that an apparent conflict exists.

4. The characterization of the adult orientation of the Cedar-Riverside community as a positive effect is incomplete and, perhaps, misleading. It ignores probable internal negative effects on the Cedar-Riverside community. Prof. David Cooperman, who has done extensive study and evaluation of both the physical and social environment of housing projects, concluded and testified that the people who like high-rise living tend to be less interested in neighbors and the local community than families might be. Mr. Jorvig, defendant's witness, testified that the community sense of a neighborhood with a high percentage of families and home ownership makes the community more stable and desirable with increased feasibility for community projects, in contrast to a neighborhood composed largely of single people.

5. The stated EIS goal of a more adult oriented project at maturity (8% children) is in conflict with the 21% population of children in Cedar Square West and the 16% proposed for river bluff—Stage II. There is no evaluation of the environmental effect of the presence of the much higher percentage of children proposed in Stage II compared to the 8% predicted for the project at maturity. Conversely there is no evaluation of whether a higher percentage of children in the ultimate project would be desirable in terms of the stated urban renewal plan and project agreement objectives. There is no evaluation of the underlying reasons why 90% of the Cedar Square West residents with children are in subsidized units or whether this has adverse environmental impacts. Without some evaluation of the changes in project design which will reduce the percentage of children below that proposed in Stage II and existing in Cedar Square West, the goal of an 8% child population in the project appears to present a conflict. An expectation that the population of children will be higher than 8% and possibly higher than the projected 16–17.5% is logical in light of the significant metropolitan demand for subsidized housing for families with children.

F. *The EIS fails adequately to consider possible adverse sociological and psychological effects related to the project's physical design and non-resident ownership.*

1. Plaintiffs' testimony established that the interrelationships of design and ownership with characteristics of occupants or

potential occupants are significant and important environmental concerns which must be evaluated. Mr. Hartman stated that such social-psychological effects as resident satisfaction with the housing environment and the extent to which the housing elicits proprietary feelings were environmental matters appropriate to an EIS. Prof. David, Cooperman, whose work has been the study of peoples' behavior in relation to specific elements of the built environment, testified that issues such as a housing development's tendency to satisfy its residents, encourage stability or transiency, elicit proprietary concerns, exacerbate (or ameliorate) friction and anxiety are important environmental concerns about which enough is known to make reasonable predictions. It seems likely in light of the metropolitan housing demand of families with children, that the percentage of children may be greater than the 8% projected. This likelihood must be discussed in weighing the suitability of alternatives as to social-psychological effects on demographic groups of differences in design and ownership. The EIS fails adequately to deal with social-psychological effects.

2. *Physical design and life style.* Many witnesses testified that different building designs were most suitable for different life styles and stages in the life cycle.

3. The testimony established that high-rise, high-density housing was most appropriate for childless households and low-rise housing for households with children. Prof. Clare Cooper testified that low-rise cluster housing was most appropriate for families with children because of the ease of outdoor play. Such housing was also highly desired by this group as it approached the generally held single family ideal although in a multi-family setting. Other witnesses testified as to the preference for housing on the single family extremity of a single family—high-rise continuum by families with children. Prof. David Cooperman testified that higher densities were more appropriate for students, lower densities and more ground level contact were thought more appropriate for households with children. Mr. Downs testified that the housing proposed for Cedar-Riverside was more appropriate for single people and households without children and that high density housing was not appropriate for families with children.

4. The evidence established that for these two groups, some housing will be more satisfactory and attractive than other housing types; that satisfaction with housing is closely related to the degree to which design elements were congruent with different populations' life styles; that different population types would be attracted to the cluster housing than to high-rises on the basis of life style needs; that the different life styles would result in different social environments; and that families with children who could afford options would not move into Cedar-Riverside.

5. There is no discussion of these effects in the EIS despite their evident environmental implications. The evidence indicates that high-rise settings for families with children could result in general dissatisfaction, as shown by high tenant mobility and that high-rise residents are generally less neighborly than low-rise residents.

6. *Negative effects of non-resident ownership.* Mr. Hartman characterized non-resident ownership as "alienating." He testified that the desire to own was widespread and resulted in dissatisfaction in many rental tenancy situations. Mr. Broun testified that ownership was an environmental concern to the extent that it contrasted with tenure desires of the population and resulted in tenant instability. Mr. Jorvig testified that the nature of the urban renewal originally proposed for Cedar-Riverside in 1960 changed as tenants replaced home owners, based on the determination that a rental population would not have the proprietary interest and community concern to support a rehabilitation renewal plan.

7. The EIS mentions tenure effects only in response to comments and appears misleading. The response to Mr. Kirschner's comments at the public hearing on the draft EIS quoted a HUD study as finding little difference between cooperative and

rental housing. The study actually found cooperatives to have lower turnover and less maintenance problems. An FHA memorandum based on the results of this study shows non-resident ownership to result in higher tenant transiency, higher maintenance costs and a higher default rate.

8. The EIS fails to disclose apparent negative effects of non-resident ownership of the New Town on the human environment and fails properly to respond to comments in this area. Thus, it provides no adequate foundation for sound decision making as to ownership alternatives.

9. *Children in high-rises.* Prof. Clare Cooper testified that most studies done on this question have reached similar general conclusions. High-rises present a greater problem to parents in allowing young children outdoors to play. The result is frustration of both parent and child, problems with indoor play and dissatisfaction of the parents with the housing. The population studied, usually low and moderate income families with children, were similar to the families with children in Cedar Square West, most of whom lived in subsidized units.

10. The Cedar Square West Residents Association testified at the public hearing on the draft EIS that there is an existing problem with children's play in Cedar Square West and suggested that all future stages provide additional play space easily accessible to family living units. The Cedar Square West resident's survey found that 66% of all residents responding rated Cedar Square West as "poor" or "not so good" as a place for young children to live. 72% of those with children five years and younger rated the complex as "poor" or "not so good".

11. The EIS appears to have understated the seriousness of the problems cited by Prof. Cooper. There are references therein to problems with child rearing, but these are not explained in enough detail to allow an accurate assessment of the probability of mitigation through design alternatives, nor is there an adequate discussion of which design features are most closely related to the problem.

12. A lack of full discussion is demonstrated in the summary of the section on children living in high-rises (2.2.4.7.10). The summary implies that any family living in Cedar Square West does so by choice; that this reflects a desire for a high-rise environment; that the developer need only provide certain amenities and services and monitor subsequent satisfaction and school progress by children to "insure livability". Prof. Cooper testified that this solution was wholly inadequate and that full understanding of the problem and the existing research regarding children in high-rises could lead only to a recommendation that families with children be housed in low-rise units with associated shared open space easily supervised from apartments. The implication that families living in Cedar-Riverside have selected the project freely is belied by the large predominance of families with children in subsidized units. The EIS fails to discuss the HUD regulations on Section VIII housing, the recently enacted rent subsidy program, which precludes housing children in elevator buildings unless there exists no practical alternative. The Court takes judicial notice of the fact presented in oral argument that the draft of this regulation was published in the Federal Register for comments in November, 1974, prior in time to the final EIS. There is no explanation in the EIS between HUD's positive comments on the high-rise Cedar-Riverside environment for children and the opposing view adopted in its general regulations for housing subsidy programs.

13. Prof. Cooper also testified that the description of outdoor play areas to be provided is highly misleading and inaccurately computes child day care space as outdoor child recreation space. The section (2.2.4.7.-8) appears seriously to misrepresent the number of play lots and amount of outdoor recreation space necessary for the children proposed to be housed in the river bluff—Stage II site. It thereby fails to disclose

probable adverse effects on the child population.

14. *Design and community.* Witnesses Hartman and Cooper identified significant design elements which encourage resident responsibility for the environment and social interaction. These features include: private or semi-private open space, subdivision of the housing into small units, sharing by small numbers of neighbors of common space and private entrances. Such features, it was shown, encourage proprietary feelings and are reminiscent of important features of the single family home ideal, encouraging the extension of such feelings into shared common space. Testimony contrasted a low-rise cluster development which maximizes these features with a high-rise project which minimizes them. The tenant populations, according to the evidence, differ greatly in satisfaction, transience, feelings of neighborliness and of belonging. The EIS fails to evaluate these elements of the proposed Cedar-Riverside housing. The Stein deposition indicates that the HUD EIS team did not consider them. Thus, the EIS fails to disclose possible significant adverse environmental effects of the project as proposed and forecloses prematurely the consideration of alternatives not possessing such adverse effects.

15. The EIS fails to provide enough design detail for the proposed Stage II to allow evaluation of social concerns or to assess the possibility for mitigation of adverse effects. Nowhere in the EIS is the specific number of stories in various structures proposed in Stage II identified. In paragraph 2.2.2.3(c) the implication given with respect to the use of the term "clustering" is misleading and represents an incorrect use of that design terminology. Cedar-Riverside is not an example of clustering, which was described in the testimony as a pulling together of smaller, low-rise building elements in a generally rural or open land area. Not enough design information was provided to allow evaluation of the probable effect of the porches and semi-private spaces provided in Stage II, upon which the EIS relies for mitigation of adverse effects of high-rise design. As proposed, the porches are not directly visible from apartments and therefore, if unsupervised, would not seem to have the desired mitigating effect upon child play problems. Prof. Cooper testified that provision of supervised play areas could be an ameliorating modification. This is not discussed in the EIS. Mr. Hartman testified as to the level of design detail necessary to make an evaluation of the social effects of a development and concluded that Stage II is not described in nearly that detail.

16. The EIS fails to consider relevant and important pieces of information, to wit, the results of the Cedar Square West resident survey conducted by Prof. David Cooperman. The existence of these results was called to HUD's attention at the public hearings on the draft EIS (F–23) and in the written comments of CREDF. The responses generally show: a lack of neighboring in Cedar Square West, an overwhelming preference by residents for single family homes, convenience rather than enthusiasm for the New Town concept as the most common reason for residing there, widespread feeling of lack of adequate recreation space, and a concensus that Cedar Square West provides a good environment for students and a poor environment for families with children. These results, striking on their face, may well lack adequate statistical reliability to draw firm scientific conclusions. However, they are appropriately pertinent to alert a decision maker to possible adverse effects and demand consideration.

G. *The EIS discussion of short term and incremental effects is incomplete and cursory in relation to delays likely to be caused by the developer's financial difficulty, and is thus not a full disclosure of adverse environmental effects.*

1. Mr. Kirschner testified as to significant adverse effects likely to occur due to delays or improper phasing of a project, if such are due to financial problems; maintenance levels would go down as structures stand longer than planned and, as funds

become scarce, maintenance is usually the first casualty. Levels of services and amenities are also likely to suffer. These matters are of serious concern as was borne out by the evidence.

2. Prof. David Cooperman testified that the level of services provided is a significant environmental effect. He wrote to HUD's social consultant:

"Section 5.3.7.3 refers to lack of services and amenities but makes little mention of such lack. If you wish you might note that the residents of Cedar Square West complain of the absence of the following: (a) a supermarket selling at competitive prices . . . (b) low cost day care. The day care question still disturbs many mothers, especially the welfare mothers who cannot afford the cost. (c) Dry cleaning; (d) movie theater."

"Something should be said about neighborhood facilities, and I think what should be said is that the developer has the obligation to plan carefully for provision of services even if funding for the services came from other sources. I say this because since C–R let its social planner, Kathi Connell go, planning for services at River Bluff simply has not proceeded."

3. Mr. Jorvig testified that provision of adequate commercial facilities was of environmental concern. Ms. McFall testified that the level of services are considered in the normal review and evaluation of a housing development proposal and that delay in the provision of a grocery store would have a definite adverse effect. She further testified that if a delay in the development of commercial facilities were likely, that fact should be brought to the attention of decision makers in an EIS. An early draft outline of the EIS showed "public and private maintenance of the project area" as an environmental impact to be considered. The discussion in the EIS on short term effects mentions none of this. The conclusion of that section is that short term effects are only temporary. There is no examination of these likely effects or of their importance.

4. The HUD EIS team was aware of the probability of delays in the project. Lesley Wiles, then Cedar-Riverside project officer, on May 1, 1974, reported on a visit of the HUD team to the Twin Cities. This memo shows: that CRA informed the HUD team the commercial centrum would be delayed, the financial viability of the project both short and long term was in doubt and that HUD take-over of the project was being considered. The Landauer report was available to HUD in late October, 1974, well before work on the final EIS was begun. This report concluded that the developer was in serious financial trouble and that the project could not proceed without the provision of significant land write-downs. The report recommended deferring further land acquisition and longer phasing of commercial development.

5. The discussion of the existing neighborhood in the EIS had been raised by internal HUD evaluations at an even earlier date. The testimony of Mr. Kirschner was that these concerns were nowhere to be found in the EIS. Mr. Stein's deposition testimony is that the HUD EIS team "didn't do anything at all" with regard to effect of the developer's potential "financial non-viability" nor with the question of physical maintenance levels. The Metropolitan Council comments also reflect this absence in the EIS.

6. The response of HUD to the Metropolitan Council's comments demonstrates a lack of the required good faith reasoned analysis in response to comments. The responses to comments dealing with interim effects (C–19 to C–25) are in paragraph (6), describing the internal effects, and (10)(1), recommending that a more detailed discussion appear in the EIS. The response to (6) is that " . . . short term effects . . . will be controlled by local controls and ordinances." There is no analysis of specific possible effect, and no consideration of whether local ordinances would control them. The response to (10) is that the council recommendations "will be implemented." Implementation would require a rewritten section of the EIS. There was no

change in this section from the draft to the final EIS.

H. *The EIS adequately discusses certain areas in contention.*

1. *Relocation.* The descriptions of the background and problems involved in relocation and the plan of the MHRA to carry out relocation are sufficient to alert a decision-maker and the informed public to the problems and the proposed solutions.

2. Failure to discuss possible sources of revenue for relocation or to analyze exhaustively the nature of potential relocation resources is not ground for finding the EIS inadequate in view of the staged nature of the development and because Stage II involves no relocation.

3. *The existing community.* The testimony established that the existing neighborhood is in one of several transitional phases which have been identifiable since adoption of the Urban Renewal Plan.

4. The discussion of the existing neighborhood in the EIS adequately describes this phase for a decision-maker. A full scale review and evaluation of the neighborhood characteristics at this time is not required because some deference can be paid to the decision in 1968 to adopt the Urban Renewal Plan. That decision gave rise to interim changes which have shaped the existing neighborhood.

IV. DISCUSSION IN THE EIS LACKS THE GOOD FAITH OBJECTIVITY REQUIRED AND EVIDENCES A PREMATURE FORECLOSING OF OPTIONS.

1. The Cedar-Riverside EIS demonstrates a pattern showing bias on the part of HUD toward justifying a previously made decision.

2. The EIS contains several important misrepresentations of fact, all of which are in favor of the development as proposed. The EIS characterizes energy use as "minimal" compared to alternatives when it is in fact extraordinarily high. It characterizes the development as "proximating" regional

housing needs when in fact it provides far fewer large units and low income units than are needed. In the discussion of ownership in the EIS, a HUD funded study of cooperatives is characterized as showing no significant differences from other ownership forms when in fact the study showed significant advantages to cooperatives. The EIS contains misstatements as to air quality in the project area.

3. The EIS demonstrates a biased selection of evidence. The EIS quotes a HUD commissioned study on New Town housing to show that density per se is not particularly related to environmental effects. It failed to mention that the major thrust of the study is that cooperative ownership provides significant social and environmental advantages over the adverse effects of other forms of ownership. The EIS discussion of the social effects of high rise development is organized around the findings of Prof. Cooper. Her major points are treated except her discussion of the problems that high-rises create for children and their parents. Nowhere in the EIS is there the systematic treatment of this topic which is necessary for an adequate assessment of alternatives.

4. The EIS adopts the comprehensive open space plan developed by the City of Minneapolis without analysis although it apparently contains a conflict with the proposal for housing on the II–B site.

5. The EIS fails to acknowledge or discuss the evident conflict between the "adult-oriented" Cedar-Riverside described in the EIS and the goals of the urban renewal plan and new community project agreement for a heterogeneous balanced community.

6. The EIS reliance on the report *The Costs of Sprawl* is unjustified. The EIS repeatedly refers to "minimal" costs and use of energy in the Cedar-Riverside project as compared to alternatives based on the findings of *The Costs of Sprawl*. The EIS fails to reveal that the "high density" community mentioned in that study, at 19 du/acre, closely resembles the existing neighborhood. There is no attempt actually

to analyze the import of that study for Cedar-Riverside at 125 du/acre.

7. The wholly inadequate treatment of alternatives is most significant, since bias is a predisposition toward one course of action. Mr. Stein's deposition indicated that there was no study undertaken of the actual impact of alternatives, no evaluation of the cost and benefits of alternatives and no detailed analysis of even the most likely and feasible alternatives. There is no acknowledgement of comments suggesting alternatives. The Alternative Section fails to provide information necessary for decision making according to the testimony of planning experts called by the plaintiff and thus prematurely forecloses alternative options.

8. There is no mention at all of the development's economic feasibility nor the necessary alternative of providing land write-down subsidies. Through the Landauer report and its own internal evaluation HUD was aware of the need for land write-down subsidies. Thus, likely alternatives were not discussed and the impact of a land write-down on the feasibility of a low-rise alternative was not considered. This omission contributed to the premature foreclosure of alternatives.

## V. THE FINAL EIS DOES NOT SATISFY FEDERAL REQUIREMENTS FOR REVIEW AND COMMENT ON THE DRAFT EIS IN THAT FAILURE TO CIRCULATE ANY DISCUSSION OF PROPOSED OPEN SPACE PREVENTED OPPORTUNITY FOR REASONABLE COMMENTS ON OPEN SPACE.

1. The Draft EIS presented no information on which comments regarding open space could reasonably be made. There was no discussion of the extent of proposed open space that would be created, the underlying basis for evaluating the adequacy of the open space proposed or the location and character of proposed open space.

2. Reviewing agencies with a particular expertise in the area of open space noted the absence of an open space plan and their inability to comment on open space without

some plan or discussion of the open space proposed for the Cedar-Riverside Area. The Department of the Interior called an open space plan an "intricate part of the proposed action" and the Metropolitan Council stated:

"It is difficult to evaluate the effects on open space since the overall open space plan required from the project is not yet completed. When it is completed, it should be subjected to a supplementary EIS review by agencies included in this review process."

3. Had the open space plan been circulated or included as a part of the Draft EIS, testimony established that many significant comments could have been made with respect to the adequacy of the open space proposal for the area. These may have provided a check and balance on the adequacy of the proposal for open space and called to the attention of the decision maker a number of areas of concern regarding the open space plan.

4. Specific problems which Roy Mann, an environmental planner and landscape architect who testified by deposition, would have called to the attention of the decision maker had the open space plan been available for comment as part of the Draft EIS were identified as follows:

(A) The Comprehensive Open Space Plan (COSP) indicates that the community park of the University-Cedar-Riverside area is Van Cleve Park. Mann would have commented on the inadequacy of that facility because it is a specialized activity recreation oriented facility and is geographically isolated from the Cedar-Riverside area across the Mississippi River and the east campus of the University of Minnesota and because of its distance from Cedar-Riverside (1–1¾ miles). There is no discussion of other areas to serve as community park facilities in the COSP or the adequacy of such facilities in terms of acreage, existing demand or geographic location.

(B) As to the proposed location of the Sixth Ward Park to serve Cedar Square West, Mann would have commented on the

proximity of the location to the freeway and the problems of noise and vibration for potential users of the park. He would have suggested the possibility of alternative locations for the Sixth Ward Park or part of the park.

The Impact·Statement notes that "outdoor activities requiring freedom from speech interference will not be programmed along the south and west edges of Cedar-Riverside," in the noise section. There is no evaluation of this problem in the COSP or the review of open space in the EIS.

(C) As to the location of the proposed neighborhood park in the Stage II—river bluff area, Mann would have commented on the location of the park facility. This is proposed to be placed below the crib wall. He would have indicated his concern about the problem of access and desirability of the park for child play and child care purposes caused by isolation created by the vertical crib wall at the site. He would have pointed out the absence of any discussion or information available to assess how residents would reach the park given this situation in either the COSP or the EIS; and that the COSP is very general in showing the location of proposed park facilities.

(D) Mann would have foreseen a possible conflict between the use of the river edge area as a neighborhood park and the designation of this area by the Metropolitan Council as a metropolitan or larger community resource; he would have expressed the opinion that such conflict in use diminishes the value of the area for each. This problem existed in the Draft EIS and was called to the attention of the Department of Housing and Urban Development by the Metropolitan Council in their comments, but is not discussed in the EIS. The Council stated:

"In terms of effects on regional recreation, *the EIS confuses the function of the riverfront as regional recreation open space with the need for local recreation open space.*

The EIS notes correctly that the riverfront is a regional recreation resource . . . soon to be developed to permit more use. However, such use could equally be by residents beyond the project area. (Emphasis supplied)

The Council's comments were prior to the designation of the area below the crib wall as a neighborhood park for Stage II and thus, the conflict may be exacerbated.

(E) With respect to the long range strategy in the comprehensive open space plan for provision of open space in the project at maturity and, in particular, in the Cedar-Riverside East area, Mr. Mann would have commented on the inadequacy of the long range strategy which does not require the reservation of particular open space land and acreage to meet future open space needs.

In Stage II, there is nowhere in the EIS a statement that park land will be reserved or take priority over the II–B housing site, while a decision to approve that housing, as presently located, will preclude park use according to the testimony of Mr. Barnhardt, Minneapolis open space planner.

(F) Mann would have directed attention to the various standards established for open space, such as the National Recreation and Park Association (NRPA) standards and the Metropolitan Council Standards, and would have commented on his evaluation of the Cedar-Riverside Open Space Plan in comparison with such standards.

Standards such as the NRPA has established are commonly used to evaluate the adequacy of open space acreage and are applicable to high density urban areas such as the proposed Cedar-Riverside area. More open space than that proposed by such standards might be desirable if the densities and points of urban concentration in a New Town such as Cedar-Riverside are such that additional open space above the standards would be desirable to further ameliorate density concentrations. The Department of the Interior and the open space consultant, EDAW, in their comments on the EIS noted the need to evaluate the adequacy of open space without acceptance of the Minneapolis COSP simply because it met City of Minneapolis standards. There is no such independent evaluation in the EIS. Each

neighborhood in the Cedar-Riverside area appears to have a significant open space deficit under NRPA standards and this should have given rise to detailed review and evaluation in the EIS. Mr. Mann would have commented on this had there been a discussion of open space in the Draft EIS or had the COSP been circulated.

(G) The COSP indicates that the "increased population could support and will require several neighborhood parks, especially in light of the high-rise nature of the housing (i. e., lack of personal open space in the sense of a back yard)." In the COSP and the EIS, there is no evidence or indication that the particular character of the Cedar-Riverside housing was considered in determining the amount of necessary open space. Mann indicated that this would have been an area on which he would have commented had there been information in the draft impact statement on the particular open space to be proposed in the area.

(H) Mann would have indicated that there is a need for specific evaluation of the demographic characteristics of an area in determining the amount and type of open space necessary. He would have commented on the fact that no such evaluation of the needs of the unique 18 to 30 age group in Cedar-Riverside was done in the COSP or the EIS. Such age data was known to the defendants and survey data shows a higher percent of the 18–30 group find the open space in Stage I inadequate than do other segments of the population.

5. The questions and comments that would thus have been made regarding the open space plan, had it been circulated or a part of the Draft EIS, are material and significant. Such questions and comments might have had an important effect in insuring an adequate evaluation and discussion of these areas by the HUD in the final EIS. They may also have served as a check and balance on the agency's evaluation of the need for open space.

6. The "30-day comment period" provided by CEQ regulations between publication of the EIS in the Federal Register and time of the permissible decision cannot compensate for lack of circulation of the COSP in the draft EIS for comment and review. Open space planning for the Cedar-Riverside project is of critical importance because high-rise, high-density housing is being proposed in an area already possessed of marginal air quality, problems of noise, vibrations, access to proposed park areas and a proposed lack of private or semi-private yards.

VI. THE EIS DEFERS TO STANDARDS OF OTHER GOVERNMENTAL AGENCIES, THUS EXCLUDING AIR QUALITY AND OPEN SPACE EFFECTS FROM COST BENEFIT BALANCING IN THE WEIGHING OF ALTERNATIVES.

1. *Air Quality.* The discussion of air quality throughout refers to Federal and state standards without evaluation of the actual impact on the human environment of levels of pollutants at "marginal" levels which do not exceed such standards. Thus, there is no possibility of balancing air quality problems caused by the development against positive aspects of the development as proposed, nor of comparing different alternatives as to the severity of their expected effect on air quality. The Stein deposition establishes that the HUD team made no effort to compare alternatives in this regard or to balance the cost versus benefits of alternatives which would improve levels of air pollution.

2. The EIS assumes that responsibility for monitoring indoor air quality has been vested in the Minnesota Pollution Control Agency. The PCA informed HUD in written comments on the draft EIS that it had no authority to set or enforce indoor air quality standards. The final EIS failed to correct this misplaced reliance. The Stein deposition shows that HUD has taken no steps to grapple with possible problems relating to indoor air quality; that there has been no attempt to establish thresholds or standards for tolerable levels of indoor pollution; and that there has been no attempt to balance the seriousness of the indoor pollution problem with changes that would

result from alternatives to the project as proposed.

3. *Open Space.* The deposition of Mr. Stein shows that HUD accepted completely and without independent evaluation the open space standards applied to Cedar-Riverside by the City of Minneapolis. There was no evaluation of whether, after a cost benefit balancing, an alternative which provided greater amounts of open space than the city's standards was desirable. The deference ignores the need for specific evaluation of the open space needs of the unique Cedar-Riverside demographic population, the unusual conditions relevant to open space in a very high-density, high-rise development and specific problems of open space adequacy as they relate to location of park facilities in Cedar-Riverside. Absent such evaluation, no meaningful weighing of alternative development plans with different open space/population distributions can be had. Thus HUD has failed to meet its obligation to consider the inter-relationship of open space with other environmental costs and benefits to seek the balance which minimizes environmental harm.

VII. FORWARDING BY MHRA OF THE HUD–PREPARED EIS FOR FILING FAILS TO MEET REQUIREMENTS OF THE MINNESOTA ENVIRONMENTAL POLICY ACT (MEPA) BECAUSE NO PART WAS PLAYED BY MHRA IN PREPARATION OF THE EIS AND BECAUSE THE EIS FAILS TO DISCUSS ECONOMIC EFFECTS OF THE PROJECT AND ALTERNATIVES AS REQUIRED BY MEPA.

1. MHRA was the "responsible agency" as defined in MEQC 26(d) (Rules and Regulations of the Environmental Quality Council) for the preparation and circulation of the draft environmental impact statement and the submission of the final statement to the EQC. Mr. Crimmins, MHRA Project Coordinator for Cedar-Riverside, testified that the EIS forwarded to and filed with the state EQC by MHRA was identical to the federal EIS. MHRA provided some written material to HUD for the EIS, but, according to Crimmins, this was solely factual data on a limited range of environmental concerns. MHRA made no suggestions as to conclusions or assignment of environmental values and played no part in the drafting of conclusions or the evaluation of alternatives. The Executive Director's memorandum to the Board of Directors states that MHRA did not "take a posture on the draft or a final public position" on the EIS. Minutes of the Board meeting at which the vote was taken to file the HUD EIS with the state show that no discussion of substantive environmental issues took place. The understanding of MHRA acting thus were stated at the Board meeting as follows: "by forwarding the EIS, the Board is not adopting it." MHRA played no significant part in development of the EIS, did not adopt it as the MHRA position, but merely acted as a conduit, and did not consider itself bound by its findings. This is insufficient under MEPA.

2. The standards of the Minnesota Environmental Policy Act (MEPA) are in large part identical to the standards of the National Environmental Policy Act (NEPA). The State EIS fails to meet the requirements of MEPA for the reasons set forth previously in these Findings, *supra,* at I–VI. In addition, it fails to meet more rigorous requirements of MEPA regarding economics and alternatives.

3. There is no discussion in the EIS sufficient to meet the more stringent requirements of MEPA regarding discussion of economic effects of projects. Witnesses Kirschner and Hartman testified to the lack of any systematic analysis of the economic effects of the projects, especially regarding public costs and benefits; each testified such analyses were important considerations in evaluating the effects of redevelopment. Kirschner testified: that EIS statements regarding "minimal" effects of the project on the costs of providing services were conclusory and, in his opinion inaccurate; that in many areas the EIS speaks of public cost but without any estimates or figures allowing the assessment of what

that cost would be; that economic distributional effects were not discussed at all in the EIS although they are an important concern, e. g. the Army Corps of Engineers commented on the draft that "other secondary effects which were not discussed may result from changes in such things as state taxes and personal income". The Hennepin County Attorney testified on the draft EIS that a cost/benefit analysis of the effect of high density redevelopment on county government should be done. The deposition of Mr. Stein shows that the HUD EIS team "didn't do anything at all in the area of economics or finance." The MHRA forwarding without supplement of the HUD EIS is deficient under MEPA because of the failure to add information in these areas.

4. The HUD EIS evaluation of alternatives fails to meet the requirements of MEPA. The requirement for an objective evaluation of alternatives is rigorous under MEPA. All reasonable alternatives are to be evaluated as to their environmental benefits, costs and risks. The reason for the rejection of each in favor of the ultimate choice must be given. The need for a rationale for the rejection of each unselected alternative requires some weighing process to decide which environmental effects are more important than others. The Stein deposition reveals this process did not take place in the HUD EIS. The forwarding by MHRA of the HUD EIS without supplement to meet the additional requirements of MEPA regarding alternatives renders the EIS inadequate.

5. The EIS identifies alternatives involving changing the Cedar-Riverside Urban Renewal Plan as "clearly differ[ing] substantially from those proposed actions" in their environmental impact. The HUD EIS authors indicate that amendments to the Urban Renewal Plan are not actions which HUD can unilaterally undertake and the discussion focuses upon the practical difficulties of initiating such changes. Modifications in the Urban Renewal Plan are the most logical mechanism for effectuating changes in the design or density of the Cedar-Riverside project. The Urban Renewal Plan is the most detailed governmental control of the scope, scale and design of the project.

6. The State EIS agency, the MHRA, has the authority to unilaterally initiate urban renewal plan changes. The importance of this role in evaluating such modifications was highlighted by the letter of Mayor Hoftstede suggesting a thorough review of the Cedar-Riverside Urban Renewal Plan and focusing on such questions as housing design, ownership and density. The MHRA Board subsequently responded to the Mayor's letter and is now undertaking such an evaluation of the environmental impact of alternatives to the Urban Renewal Plan. The HUD evaluation of this alternative, focusing as it does on the practical impediment of its inability to initiate plan changes, is inappropriate and inadequate as an evaluation of this alternative for the state agency with independent authority for such action. When alternatives rest within the autonomous jurisdiction of the state EIS agency, they must be independently evaluated by that agency in terms of their environmental benefits, costs and risks, with an indication of the reasons for their rejection in favor of any ultimate choice made. Here, the MHRA has failed to supplement the HUD EIS with an adequate discussion of the alternatives available in changing the Urban Renewal Plan and thus the EIS fails to meet the requirements of state law for the consideration of all reasonable alternatives.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction of this action *inter alia*, pursuant to the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*, and 28 U.S.C. § 1331(a). State law questions are reviewed pursuant to the pendant jurisdiction of the Court, all arising out of a common nucleus of operative facts.

2. The Environmental Impact Statement (EIS) fails to indicate the cost and benefits of the proposed action and various alternatives to it, fails to indicate the weight given to economic and technical

considerations, fails to indicate the effects the project finances will have on consideration of alternatives and their feasibility, and therefore, strikes an arbitrary balance of cost and benefits and clearly gives insufficient weight to environmental values compared to the economic and technical considerations in violation of NEPA, § 102(2)(E).

■ 3. The final EIS for the Cedar-Riverside project, both Stage II and the project at maturity, fails adequately to describe the proposed action and its Environmental Impact as required by NEPA, § 102(2)(C)(i). The Cedar-Riverside EIS fails to adequately describe and evaluate irreversible and irretrievable commitments of resources which will result from the decision to build Cedar-Riverside as proposed, in violation of NEPA, § 102(2)(C)(ii) and (v).

■ 4. The Cedar-Riverside EIS fails to adequately disclose and discuss reasonable alternatives to the proposed action as required by NEPA, § 102(2)(C)(iii).

■ 5. The failure to circulate any information on open space in the draft EIS prevented interested governmental agencies and the public, with responsibilities or expertise in the open space environmental area, from commenting on the adequacy of consideration of open space in the ESI, in violation of NEPA, § 102(2)(c).

■ 6. The EIS fails to "study, develop, and describe appropriate alternatives" because it fails to describe numerous reasonable alternatives to the proposed project and fails to quantify and compare environmental effects of each alternative in a systematic manner, in violation of NEPA, § 102(2)(D).

■ 7. The EIS does not meet the standard of objective good faith required by NEPA.

■ 8. The Cedar-Riverside EIS is too vague, general and conclusory to satisfy the requirement of NEPA for explanation of the underlying reasoning behind its conclusions and findings pursuant to the requirement that a "detailed" statement be prepared, in violation of NEPA, § 102(2)(C).

■ 9. For the reasons set forth in paragraphs 2 through 8, and because of a failure of the MHRA sufficiently to participate in the EIS preparation process, to consider additional environmental impacts set forth in state law, to evaluate alternatives in the greater detail required by state law and to consider and evaluate those alternatives specifically within the power of the state EIS agency, the Cedar-Riverside EIS violates the requirements of the Minnesota Environmental Policy Act (MEPA), Minn. Stat. § 116D.04.

■ 10. The determination to proceed with the Cedar-Riverside project as proposed based on this environmental impact statement is arbitrary and capricious, fails to give sufficient weight to environmental values, is the result of an arbitrary balancing of cost and benefits and is in violation of the substantive policies of MEPA and, as to the state, local and developer defendants, the Minnesota Environmental Rights Act, § 116B.01 et seq.

Date: <u>August 30, 1975</u>

(s)<u>Edward J. Parker</u>
   Special Master

### COURT'S ORDER

MILES W. LORD, District Judge.

The Court, having received the Findings of Fact, and Conclusions of Law of the Special Master and having considered the Special Master's Memorandum, makes the following:

### ORDER FOR JUDGMENT

1. Defendants, and each of them, are hereby permanently enjoined from taking any action in furtherance of the Cedar-Riverside project as proposed, both Stage II and any other part of the project, until defendants can show that they have satisfactorily complied with the requirements for a detailed environmental impact statement pursuant to the National Environmental Policy Act and the Minnesota Environmental Policy Act.

2. Defendants are permanently enjoined from any further activity on the Cedar-Riverside project as proposed, both Stage II and any other component of the project, until, upon the completion of an adequate Environmental Impact Statement, it is shown to the Court's satisfaction that the decision to proceed with the Cedar-Riverside project is not in violation of the Minnesota Environmental Rights Act, is not arbitrary and capricious and is not in violation of the substantive standards of MEPA and NEPA.

LET JUDGMENT BE ENTERED ACCORDINGLY.

## ORDER

WHEREAS, the City of Minneapolis moves the Court to exempt certain projects from the injunctive Order in this case and the City and the plaintiffs have proposed by stipulation an amendment to the Order of this Court entered March 29, 1976, to allow planning, construction and other activity on certain projects and actions not in furtherance of the Cedar-Riverside New Town Project as proposed enjoined pending compliance with the National Environmental Policy Act; and

WHEREAS the modified Order proposed by said parties is appropriate and equitable, the motion of the city is hereby granted as set forth below; and

IT IS HEREBY ORDERED that the Order entered by this Court on March 29, 1976 be amended as follows:

By adding after the existing language the following proviso:

PROVIDED THAT:

1. Projects meeting the following criteria and as specified below shall not be enjoined pursuant to this Order:

A project which is necessary to satisfy the needs of the existing Cedar-Riverside population or which is normally scheduled as a part of an ongoing city-wide obligation or program without special reference to the Cedar-Riverside Urban Renewal Plan.

2. Examples of projects falling within the above enumerated guideline include:

A. Completion of the Tenth Avenue bridge-head at Nineteenth Avenue to First Street which is currently under construction.

B. Construction of approach to Tenth Avenue bridge on Nineteenth Avenue from Washington Avenue to First Street.

C. Reconstruction and upgrading of Riverside Avenue from Nineteenth Avenue to Twenty-fifth Avenue, provided it entails no change in width necessitating further acquisition.

D. Restoration of Dania Hall.

E. Planning and construction of a congregate dining and community facility at Cedar Hi site.

F. Expansion of Sixth Ward Park.

G. Planning, construction, and development of the riveredge open space and associated facilities, but not of the River Road extension.

H. Allocation of Community Development Block Grant funds to the West Bank Co-op Grocery and the West Bank CDC for development of a grocery store at the former Thrifty Market site and planning regarding alternative land uses in Cedar-Riverside, respectively.

3. Any party may by motion request the Court to review a specific project to determine whether further activity on that project is consistent with this Order.

## ORDER

WHEREAS, The City of Minneapolis moved the Court to exempt certain projects from the injunctive Order in this case and the City and the plaintiffs proposed by stipulation an amendment to the Order of this Court entered March 29, 1976, to allow planning, construction and other activity on certain projects and actions not in furtherance of the Cedar-Riverside New Town Project as proposed enjoined pending compliance with the National Environmental Policy Act; and

WHEREAS, the modified Order by said parties was entered by this Court on May 14, 1976; and

WHEREAS, further clarification of that Order is necessary, as set forth in the stipulation of plaintiffs and defendant, City, filed herein, to identify specifically the project intended in Paragraph 2.H.

IT IS HEREBY ORDERED that the Order entered by this Court on March 29, 1976 and amended on May 14, 1976, be further amended as follows:

By adding to Paragraph 2.H. of the May 14, 1976, Order of this Court the following sentence:

The block grant to West Bank CDC from the City referenced here is for planning a rehabilitation project for part of the Cedar-Riverside area and a lower density alternative new housing project for the riverbluff area, both alternative land uses within the meaning contemplated by the parties herein. Such block grant is identified as "Cedar Riverside Development Project, No. AD–2."

## APPENDIX

### SPECIAL MASTER'S MEMORANDUM

It was candidly admitted at the outset of these proceedings, by counsel for the defendant Minneapolis HRA, that if a discussion of the underlying economics of the project was required by NEPA to be included in the EIS, then this EIS would necessarily be held inadequate, for no such discussion would be found therein. The act affords scant guidance, merely requiring that all Federal agencies shall:

"Identify and develop methods and procedures, in consultation with the Council on Environmental Quality . . . which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decision making along with economic and technical considerations;" 42 U.S.C.A. § 4332(B)

The requirements of an EIS are set forth in the next paragraph of the act. Application of this section was considered by the District of Columbia Circuit in *Calvert Cliffs Coordinating Committee v. United States*

*Atomic Energy Commission*, 146 U.S.App. D.C. 33, 449 F.2d 1109, 1113 (1971) thus:

" 'Environmental amenities' will often be in conflict with 'economic and technical consideration'. To 'consider' the former 'along with' the latter must involve a balancing process. In some instances environmental costs may outweigh economic and technical benefits and in other instances they may not. But NEPA mandates a rather finely tuned and 'systematic' balancing analysis in each instance."

The plaintiffs, in this Cedar-Riverside case, have made a challenge to the basic economic assumption of the EIS that:

"Land economic factors . . . are an important aspect of deciding how to use land. Urban centers usually have relatively high land values, even when existing buildings are obsolete or deteriorating . . . *maximizing the potential capacity of a high cost land* is not only necessary to create a financially viable project but also permits lower rent ranges for occupants than would result if such opportunities were neglected." EIS p. 153, 4 § 2.2.2.3(f). (Emphasis supplied)

It is the claim of plaintiffs that land costs were allowed to predetermine the kind of development to be accepted for Cedar-Riverside, i. e. high-density development including high-rise buildings. It is their further claim that this underlying assumption was false because, according to HUD internal memoranda and reports, the project never *was* "economically viable" without considerable public subsidies in the form of "land cost write-downs". If it is true that we have been led to accept environmental costs otherwise avoidable on the basis of a false economic assumption, then the "balance" has been fatally mis-weighed.

A very recent (June, 1975) United States Supreme Court case might lend some guidance in this largely uncharted area. In *Aberdeen and Rockfish R.R. v. SCRAP*, 422 U.S. 289, 95 S.Ct. 2336, 45 L.Ed.2d 191, 7 ERC 2009, the court said that in view of the very limited nature of the federal action there being scrutinized, a "rudimentary ex-

amination" of the underlying economics (there the underlying rate structure) in connection with environmental factors was all that could be required. Here, the federal action is not so limited, yet not even a "rudimentary examination" of the underlying economics of the project has been given to the decisionmaker and the public for consideration in the balance with economic effects.

The extent to which the EIS should address this question should be determined by the common sense rule adopted in *Iowa Citizens for Environmental Quality, Inc. v. Volpe,* 487 F.2d 849, 852 (8th Cir. 1973) [*Iowa Citizens v. Volpe*]:

"The environmental statement 'to some extent must be examined in light of the particular facts and circumstances surrounding the project . . . in order to determine its sufficiency. The extent of detail required must necessarily be related to the complexity of the environmental problems created by the project.'"

Had even a rudimentary examination been included in the EIS, presumably it would have turned up two significant documents received in evidence. Plaintiffs Exhibit 17, the Landauer report dated October 26, 1974, informed the New Communities Administration of HUD that " . . . the fundamental problem with the Cedar-Riverside development centers about the cost of the land. Without considerable write-downs on the land we can see no way that the project can proceed on a sound financial basis." An even earlier internal HUD memorandum from Lessley Wiles, Plaintiffs Exhibit VI, dated May 1, 1974, recommended "specific action on the part of NCA to explore and develop options for takeover of the project . . . ." After having expressed strong reservations on "the subject of the financial viability of the Cedar-Riverside Project over the short and long-run . . . ." It is painfully apparent that HUD had abundant notice, prior to preparation of the EIS that the economic assumptions upon which the project was approved were invalid.

The testimony at trial established beyond any serious question that if land write-downs were applied sufficiently to be of significant assistance, it would alter the economics of such a project in a fundamental way. With high cost land it may well be true that it is necessary to maximize the potential capacity of the land through high-rise construction. However, if the cost of the land is virtually eliminated as a significant variable, the vastly lower cost of low or medium-rise construction becomes economically dominant. It is easy enough to see why the investors in Cedar-Riverside would prefer to see the greater part of their investment go into high-rise buildings, even though that requires class A construction; the obvious advantage of such depreciable assets as high-rise buildings for the tax-shelter conscious need not be stressed. Land, on the other hand, cannot be depreciated and if its cost is held a low constant it must account for a higher proportion of the total investment in low-rise construction than in high-rise.

Why HUD seemingly preferred to see high-density, high-rise construction (125 dwelling units per acre) at Cedar-Riverside is difficult to comprehend given the environmental costs one is then forced to accept, such as:

—Possible adverse effects on already marginal air quality in the area.

—Possible fire dangers caused by increased traffic congestion coupled with dangerously limited access to buildings too high for available ladders and not fully equipped with sprinkler systems.

—Sorely limited recreational open space of the neighborhood park category.

—Aesthetically adverse effect of "walling in" the river gorge area by high-rise buildings set close to the bluffs.

—Limitation of access and view of those to the west of Stage II A and B sites.

—Foreclosing of an opportunity vastly to enhance the Riverbluff prospect from the east bank of the river.

—Possible adverse effects on children housed in high-rise buildings. This is particularly significant in view of the

dubious projection of only an 8% child population in the project at maturity compared to the 21% found in Cedar Square West.

—Failure of the proposal to proximate the regional demand for larger rental units and low income units.

Other costs are discussed in the Findings of Fact but these seem strikingly illustrative. To accept such drastic costs because of unexamined and dubious economic assumptions is to reduce the entire process to a charade.

NEPA requires an independent evaluation of the environmental effects by the responsible agency. It requires a balancing of these effects against the benefits to be gained by the chosen course of action. As Judge J. Skelly Wright said in *Calvert Cliffs, supra*, 449 F.2d at 1123:

"In each individual case the particular economic and technical benefits of planned action must be assessed and then weighed against the environmental costs; alternatives must be considered which would affect the balance of values. The magnitude of possible benefits and possible costs may be anywhere on a broad spectrum. Much will depend on the particular magnitudes involved in particular cases. In some cases, the benefits will be great enough to justify a certain quantum of environmental costs; in other cases they will not be so great and the proposed action may have to be abandoned or significantly altered so as to bring the benefits and costs into a proper balance. The point of the individualized balancing analysis is to ensure that, with possible alterations, the optimally beneficial action is finally taken."

This lucid exposition of the basic decisional process throws a shaft of light on the defects of the EIS here. Let us examine the two sides of the balancing scale:

1. The "economic benefits of the planned action" were not assessed. High density development was *assumed* to be necessary to create a financially viable project [EIS 2.2.2.3(f)]. Yet the evidence before this court clearly showed that HUD was aware that the project was not financially viable without considerable write-downs in the cost of the land. This being the case, the lower rise, lower density alternative is actually *more* feasible from a construction cost standpoint than the project being recommended. Thus, the benefit side of the scale, had it been "assessed" instead of being *assumed*, would have been considerably lightened, causing the environmental cost side to be afforded greater weight.

2. The cost side of the scale has, however, been afforded far too little weight as to some factors and has been given far too superficial consideration as to others to allow the decision maker to make an informed judgment of what weight to allow. In deferring to the indirect source standards of the state PCA as to air quality, the EIS runs afoul of a basic point established in the *Calvert Cliffs* case; if all that is done is to require compliance with the standards of other agencies, the NEPA procedures, treated as superfluous, will soon wither away in disuse. "Certification by another agency that its own environmental standards are satisfied involves an entirely different kind of judgment" than that mandated to the responsible agency by NEPA (*Calvert Cliffs, supra*, at 1222–3). Yet that is just what was done here with indirect source standards as to air quality and with neighborhood park acreage standards as to open space. This mechanical delegation of judgment, to agencies not charged with the responsibility under NEPA to make that judgment with all the weights in the balance, was called an "abdication" by Judge Wright and so it seems here. The light of his insight throws into sharp relief the casual "buck-passing" attitude of such delegation when the problem of indoor air quality is faced.

Although the EIS recognized that in high-rise, high-density buildings built without filtration systems in an area already possessed of marginal air quality the inhabitants would be placed in a "living environment of low quality", HUD developed no criteria to determine what steps should be taken but left to the State Pollution Con-

trol Agency the solution of the problem. The undisputed testimony at trial established that the Minnesota PCA has no statutory authority to regulate interior air quality. HUD was informed of that fact in the comments on the draft EIS and showed no change in attitude. Thus, the assessment in the EIS that the "living environment of low quality" would be improved or the problem solved by the State Agency is without basis in fact.

Not only is the EIS deficient in failing to examine the underlying economic assumptions justifying the project, there is no analysis of public costs and benefits of this project relative to such an analysis for alternatives deemed reasonable. Mr. Kirschner's testimony on this point seemed well-taken. He explained that a plus-minus charting could be developed as to various factors in the public sector given different alternatives. Many of these, such as costs to public agencies and expected tax revenue increases could even be quantified. The lack of any such comparative analysis strikes at the very heart of the process for, "It is well established that NEPA is an 'environmental full disclosure law,' such that administrative agencies of the federal government must develop and consider all the environmental consequences of their decisions" *Iowa Citizens v. Volpe*, at 851.

Had the Landauer report been considered and had a cost-benefit analysis of the effect of this proposal on the public sector been done, quite different results might well have obtained in the environmental "balancing" in the EIS. Alternatives might well have taken on an appearance of greater vitality and advisibility.

As I have discussed above, a decision maker would not be able to make an informed judgment as to the environmentally optimal alternative without insight into the underlying economics of the project. If the cost of land is so high as to require a land cost write-down, consequences flow immediately, such as:

1. The effect on local government finances—if tax revenues are used to subsidize the land cost write-down, there may

well be a net negative effect—thus lending a different color to the city's obligation to provide the additional services necessary to cope with high-rise, high-density development.

2. Increased feasibility to low-rise development if land costs are publicly subsidized by a land write-down to an artificially low "set" figure. The reduced cost of low-rise construction could then render this alternative much more likely because of its many positive environmental effects, assuming a concurrent lower density. Such a plan would reduce the need for additional city services and might relieve some of the strain on the public treasury. Of course, expected increases in tax revenues might also be more modest. As former Mayor Arthur Naftalin, a consultant for and witness called by defendant Cedar-Riverside Associates, properly pointed out in his testimony, the question here is—"have all relevant dimensions been presented to the decision maker?" If the land costs are so high as to require high-rise, high-density construction to recover investment, this should have been thoroughly discussed but was only touched upon in the EIS. If it were known to the drafters of the EIS that, even so, the project is uneconomical absent a land cost "write-down" then the *dimensions* of the problem have been changed. These dimensions are relevant because they have pre-ordained the kind of project to be proposed and the decision maker has not been informed of the likely change. He is thus led to accept environmental detriments he might not otherwise be willing to accept because pertinent information, crucial to his judgment, has been withheld from the balance.

In *Silva v. Lynn*, 482 F.2d 1282 (1st Cir. 1973), the First Circuit said that the EIS (for a proposed housing development) was inadequate in that its justification for a proposed drainage plan and for the proposed number and placement of housing units lacked sufficient discussion of alternatives and a reasoned basis for the choice made. So, too, here. The discussion of alternatives is insufficiently informative to

provide a reasoned basis for choice. As the court there said "perhaps most substantively, the requirement of a detailed statement helps insure the integrity of the process of decision by *precluding stubborn problems or serious criticism from being swept under the rug*." 482 F.2d at 1285 (Emphasis supplied) Here the serious criticism of the underlying uneconomic assumptions of the project *were* swept under the rug. Had the Landauer Report and the Wiles memo been included in the EIS, can it be seriously doubted that a vastly different picture of the attractiveness of this project, as compared to various feasible alternatives, would have been presented to the decision maker and the public? To paraphrase the court in *Silva, supra,* "a conclusory statement (such as "maximizing the potential capacity of high cost land . . . is necessary to create a financially viable project . . . " EIS p. 154) unsupported by . . . empirical data . . . or explanation information . . . not only fails to crystalize issues, but affords no basis for a comparison of the problems involved with the proposed project and the difficulties involved in the alternatives. Moreover where comments from responsible experts . . . disclose new or conflicting data or opinions that cause concern that the agency may not have fully evaluated the project and its alternatives, these comments may not simply be ignored. There must be a good faith, reasoned analysis in response." 482 F.2d 1285. *See also* Judge Heaney's comments in *Environmental Defense Fund v. Froehlke,* 473 F.2d 346 at 351 (8th Cir. 1972).

Obviously, if the land cost is necessarily to be written down, such cost no longer dictates maximizing the potential capacity of the land (high density) to create a financially viable project. The comment from the HUD retained consultant Landauer contained new and conflicting data or opinions and was "simply ignored". There was no good faith, reasoned analysis in response; on the contrary, the determinative assumption was shown on the responsible expert's report and in the Wiles memo, to be valid and this information was sup-

pressed until this litigation forced it into the open! As stated in *Environmental Defense Fund v. Corps of Engineers,* 325 F.Supp. 749, 759 (E.D.Ark.1971) "at the very least the NEPA is an environmental full disclosure law."

The *Silva* case is, in principle, much like the one at bar. There, the likeliest alternative was rejected because it would "substantially reduce the number of units, an economically unsound alternative". The court said the EIS must go beyond such mere assertions and show the basis for them, to avail prematurely foreclosing options which might have less detrimental effects. Exactly that failure is present here. That case, too, involved an arrangement with a private developer and the court took pains to point out that the relative novelty of the case did not justify abdication of responsibility by the reviewing court to see that the EIS conformed to the requirement of NEPA.

It should also be noted that *Silva, supra,* disposes of any question of the consideration here of the Wiles memo, the earliest known expression of HUD's misgivings about this project. The court there said that the law required production and, insofar as relevant, consideration by the trial court of the "entire administrative record." The First Circuit advised that comments not only on the draft EIS but on new approaches or subsequently developed evidence should be reviewed and considered by the reviewing court. The Wiles memo was within the scope of discovery sought by plaintiffs and not produced until the formal evidence-taking process had closed. It should have been, and has now been received in evidence and is here considered a part of the full agency record before the court for judicial review.

Much was made, in the criticisms of the draft EIS and by suggestion of CREDT, of the possibility of rehabilitation of the area as a feasible alternative. The Urban Renewal Plan originally proposed for the area attempted to encourage rehabilitation by the private landowners. This was not effective. The present renewal plan has gen-

erally reflected this approach and development of the West Bank Campus of the University together with other institutional expansion has seemingly doomed any such efforts to ineffectuality. The present condition and composition of the neighborhood quite clearly reflects a transitory stage.

To be sure, there was real question raised of the degree of deterioration of the buildings recited in the EIS. To ask the present developer-owners, who have made a serious effort to maintain the buildings until staged for demolition, to rehabilitate buildings they own and wish to replace, smacks of fundamental unfairness. Just compensation must be paid for property taken for public use and forced rehabilitation, here, would be tantamount to a taking.

A number of shortcomings found in the EIS concerned the provision of open space in the projected development. The inadequacy of the presentation of these problems to the decision maker and the public was aggravated by the failure of HUD to circulate the Comprehensive Open Space Plan for comment and review. It was unfortunate that the COSP was not completed in time to be circulated with the draft EIS for it badly needed critical evaluation by the public and by agencies possessing expertise in the field. Had it been circulated subsequent to the draft EIS and the comments either discussed or heeded and acted upon then, at least procedurally, NEPA might have been satisfied.

However, the failure to circulate the COSP here is, realistically, more than a mere procedural shortcoming. It has seemingly led to a superficiality of consideration—a glossing-over of problems, robbing the reader of judgments which should have been helpful in deciding how much weight to put in the balance for open space deficiencies.

The similarity of the instant failure to include the COSP for review and comment by other federal agencies, as suggested by the Metropolitan Council and implicitly by the Department of the Interior, to the factual setting of *Natural Resources Defense Council v. Morton*, 337 F.Supp. 170 (DDC 1972) is striking and dispositive of this issue. This COSP, like the discussion of alternatives there, must be viewed essentially as a draft statement. "If this addendum is to be considered a part of the Final Impact Statement, then it must be subjected to the same comment and review procedures outlined in section 4332(2)(C) of NEPA"—as the rest of the EIS, to paraphrase that court's language at page 172.

The evidence presented at trial abundantly demonstrated the crucial nature of the requirement for circulation and its applicability to this case. Here, as in the cited analogous case, the consequent economic costs are factors not to be ignored but which cannot be allowed "to strip the section of its fundamental importance." Particularly is this so due to the unique vulnerability of Cedar-Riverside to the drastic consequences of possible planning error as to the adequacy of open space provisions. The existing marginal air quality, the demographics of the projected population and the aesthetic values of the river gorge and bluff present possibilities for enhancement or disaster to the environment, depending on the adequacy of the planning. The most diligent scrutiny of the OSP by those most concerned and best informed was a vital necessity. Quite the converse actually obtained, however.

HUD merely acceded to Minneapolis standards as to neighborhood and community park acreages without analysis of the practical applicability of such standards to this unique area. HUD appeared to ignore a possible conflict between neighborhood and regional use of Riverside Park acreage and missed a conflict in proposed use of land in the Stage II—Riverbluff Area between neighborhood park planning in the OSP and building construction. It should be noted that the staff of the Metropolitan Council assumed that the COSP would be circulated for supplementary review by appropriate agencies since the question of open space was so crucial to the project. Mr. Jorvig, in his courtroom testimony, likewise indicated a need for review of the OSP in a comprehensive fashion.

The deposition testimony of Mr. McMann, an environmental planner and landscape architect of impressive background, was believed by this reader to be most significant. He brought out many areas of concern about the open space provisions which should have been presented to the decision maker and the public. The thrust of his criticism was at the almost thoughtless acceptance, by the drafters of the OSP, of the applicability of the general park acreage standards of the Minneapolis Park Board to Cedar-Riverside.

After all, these are standards drawn to apply to the "City of Lakes" whose boundaries include great expanses of open water surrounded by park land. The City is characteristically settled with single-family residences or low-rise, low-density apartments. Cedar-Riverside, however, is atypical of the city.

High population density, largely composed of young adults, is here planned for an area adjacent to downtown and the University and which is defined by three high volume highways. This is proposed for an area which possesses marginally acceptable air quality even with its present abnormally sparse population. The inescapable checkerboard pattern of the development of the remaining land in the area seemingly renders the Park Board's conceptualistic planning scheme (based on defined neighborhoods within defined communities) of dubious relevance to a projected development unlike anything else in the city. Cedar-Riverside insofar as Minneapolis is concerned, is "sui generis" and the bland assumption that standards applicable generally to this city are adequate for the citizenry to be located there should have been examined with a jaundiced eye.

If space for neighborhood parks is available only on the periphery and in limited amounts, and the periphery is next to freeways with noise and freeways with vibration problems—or as part of the Riverside Park area presently regarded as a *regional* park, then perhaps insufficient consideration was given to the value of yards and interior or enclosed semi-private areas available in low-rise cluster development. Perhaps this limited availability of open space in Cedar-Riverside proves the area is not suitable for high-rise, high-density development. Perhaps this amounts to a preclusive limitation!

This litigation has shown, in a most striking and graphic fashion that had the OSP been afforded appropriate circulation, a great deal would have been brought to the attention of the decision maker and the public for informed judgment. (See *Findings*, pp. 39–42 and 56–59). It seems a crucial function of the EIS has here been short-circuited and as to a fact which is of critical concern to the environmental acceptability of the proposal. A reasoned decision cannot be made upon such a basis.

This writer has concluded that the procedural requirements of NEPA are indispensable as to a concern of the EIS so significant as the open space plan for this project. Those procedural rules have not been followed here and, as a result, a great deal has been "swept under the rug." That is exactly what was meant to be avoided by the legislation and this EIS cannot be held to be adequate until this plan is circulated for review and comment.

The decision to proceed with Cedar-Riverside based on this EIS is arbitrary and capricious and violates standards of NEPA. The Eight Circuit has made clear in *Environmental Defense Fund v. Corps of Engineers (Gillham Dam)* 470 F.2d 289 (1972), *cert. denied*, 412 U.S. 931, 93 S.Ct. 2749, 37 L.Ed.2d 160 (1972) that substantive rights are created by NEPA § 101 and that the standards of review are: First, whether the agency acted within the scope of its authority and next, whether the decision reached was arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law.

The conclusion has been reached here that the decision was reached without a good faith consideration and balancing of environmental factors for the reasons set forth earlier herein. The decision reached, on the balancing of factors presented in the EIS, was arbitrary and capricious of neces-

sity for an informed judgment could not be made on the information as presented.

While trying earnestly not to substitute one's judgment for that of the drafters of the EIS, it must be admitted that certain decisions seem almost inexplicable. To be sure, subjective impartiality is not required of the drafters but even the "good-faith objectivity" suggested as the test of compliance with NEPA § 102 in the *Gillham Dam* case, *supra*, is lacking here. Evidence of this lack is seen in the mischaracterization of energy use of the project as "minimal" compared to alternatives, the misstatements as to air quality in the area, the erroneous conclusion that the project proximates regional housing needs, and the premature foreclosing of options by suppressing known misgivings as to the economic feasibility of *this* option. The case may simply be a classic one of the bureaucratic predisposition of any agency to justify existing decisions, as the course of least resistance.

The rules and regulations of the Minnesota Environmental Quality Council requires the Minneapolis HRA as the "responsible agency" selected by the Metropolitan Council, under Minnesota regulation MEQC 26(d) to prepare the final EIS. No reason appears in good sense or justice why an entirely separate EIS should be prepared by the MHRA for purposes of compliance with MEPA if the EIS prepared by the federal agency is adequate for state purposes and complies with MEPA. No virtue in mere duplication suggests itself. It is an aphorism of legislative construction, given the effect of law, that "the legislature is presumed not to intend an absurdity". It appears that defendants' trial memo misses the point raised by plaintiff, however, when the former is claimed to have espoused the position that the MHRA was required to have "reviewed and commented" on the Federal EIS.

This writer is persuaded of the accuracy of plaintiff's analysis in analogizing to the federal decisions on delegation to another preparer of a section of an EIS. The test there is whether there was active participa-

tion or "rubber stamping". In *Citizens Environmental Council v. Volpe*, 484 F.2d 870, 873 (10th Cir. 1973) the basis of that court's approval of the Secretary of Transportation's action is utilizing the EIS prepared by the Kansas State Highway Commission was that the latter prepared the statement in consultation with state, federal and private agencies; the court specified that the Secretary did not simply " 'rubber stamp' the State's work. He reviewed it *and adopted it as his own* " (emphasis supplied).

If this is what is required to justify a federal agency in adopting a state prepared EIS why is not the converse true? Yet here the record does not show that the responsible state agency "reviewed it and adopted it as its own". Quite to the contrary, it appears they did, in fact, do no more than merely rubber stamp it. While duplication of such an effort is surely preposterous, *some* exercise of judgment is required for practical compliance with the state EPA. Mere "filing" of the EIS with the state EQC was seen as an avoidance of specific adoption of the statement, preserving the MHRA's flexibility regarding possible changes in the Urban Renewal Plan.

How can it be maintained that the MHRA has complied with MEPA? It did not "prepare" the EIS as the regulations require; it did not "extensively participate" in the preparation as the Eighth Circuit found acceptable in *Iowa Citizens v. Volpe*, 487 F.2d at 854. There the District Court specifically found that and the Circuit Court characterized that agency's participation as "review, modification and adoption by the FHWA of the statement as its own". The MHRA specifically avoided adopting the HUD prepared EIS. The evidence here indicated the converse of the finding in *Life of the Land v. Brinegar*, 485 F.2d 460, 467 (9th Cir. 1973) that the EIS " 'was more or less a joint effort . . .' " (of both the federal and state agencies responsible for preparation). This writer is forced to the conclusion that there was more than an acceptable delegation in this case and that the MHRA's action is merely forwarding the HUD prepared EIS for "filing" consti-

tutes an abdication of their responsibility under the state act and regulations.

The specific mandate of MEPA § 116D.04, subd. 1(b) that there be included in the EIS "any . . . adverse . . economic . . . effects that cannot be avoided should the proposal be implemented" renders this EIS inadequate for MEPA purposes even should the impermissible delegation be overlooked. The testimony of Messrs. Kirschner and Hartman was persuasive in this regard. The state has impliedly stated that it and the local community have an economic stake in such projects and insists that a careful assessment be done. The expert witnesses indicated what they thought would be necessary and Mr. Kirschner even described how a cost-benefit charting could be set up to illustrate the effect of a given project on local finances. His expertise in the field of economic and fiscal effects on the public sector seemed well established and was most impressive to this finder of fact. The EIS's treatment of these important impacts was, according to the testimony and in this writer's view, superficial and inaccurate.

Such a cost-benefit analysis would have been of enormous assistance to the consideration of alternatives and is specifically required by MEQC regulation 31(f). That section seems a veritable catalog of shortcomings of this HUD EIS for state purposes. Here we have found something less than an objective evaluation of all reasonable alternatives. The reasons for rejecting alternatives in favor of the proposed action is not made clear at least from an economic or fiscal impact standpoint. Options requiring possible modifications of the URP were prematurely foreclosed by stating that HUD was lacking such authority without recognizing that the MRHA was not so limited. For state purposes alternatives requiring changes in the URP should have been considered and a balancing of the advantages and disadvantages of each reasonable alternatives' economic and fiscal effects should have been a prominent feature thereof.

These more specific requirements of state law would foreclose the simple adoption of the federal EIS even if the adoption were done by reasoned judgment. Somewhat more is clearly required for Minnesota compliance than is present in this statement.

In closing, this writer feels an obligation to make certain observations on the developing art of EIS drafting. The basic purpose of the statement is to lay the proposal before the public and the decision-maker in an understandable, complete and unbiased way, to the end that the decisional process be accomplished in a more enlightened way than the past.

After an exhaustive study, involving several readings of the 350-odd page document that is the basic EIS, together with over three weeks of courtroom testimony and further weeks of study of the documentary evidence presented there, one begins, dimly, to perceive that it is far easier to change the *form* of that decisional process than it is the substance. Here, as this court has also found in the Boundary Waters Canoe Area case, a highly selective presentation of evidence in the EIS allows the drafters to force the reader to a predetermined result.

In the BWCA case the mechanism was an artful grouping of "alternative packages" which was so structured as to seem to preclude a decision to halt lumbering in the Portal Zone. After much scrutiny, this court perceived that "the deck had been stacked" and said so. Here the selective presentation of evidence was accomplished by the far simpler expedient of omitting any discussion of known fallacies in the underlying economic assumptions justifying the proposed high-density high-rise development at Cedar-Riverside. The study purported to view the possibilities for a residential development on very high-cost land which seemingly *dictated* high densities. It was within the knowledge of HUD that a public subsidy was necessary to "lower" the cost of the land. The high-densities and high-rise construction were dictated only by profit-making and, probably, by tax-shelter considerations.

As in the BWCA case, the new era of enlightened public decision-making, thought to be heralded by NEPA, has been distorted, resulting in a sophisticated and highly expensive variant of the long-familiar bureaucratic tendency to justify decisions previously made. It is devoutly to be hoped that judicial review can restore to the act the vitality with which Congress attempted to endow it.

August 30, 1975
    Date

s/Edward J. Parker
        Special Master